284 So.2d 42 (1973)
Richard John McHALE
v.
STATE of Mississippi.
No. 47424.
Supreme Court of Mississippi.
October 1, 1973.
Rehearing Denied October 29, 1973.
Roy O. Parker, Parker, Randle & Winston, P.A., Tupelo, for appellant.
*43 A.F. Summer, Atty. Gen., by T.E. Childs, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
PATTERSON, Justice:
Richard John McHale was convicted of the murder of his wife and sentenced to life imprisonment in the state penitentiary. He appeals to this Court from his conviction and sentence by the Circuit Court of Lee County.
Appellant, hereinafter McHale, an indigent, presently contends that he was denied due process and equal protection of the law since he was not furnished a transcript of the preliminary hearing. He also argues that he was prejudiced by an instruction granted the State, by the court's refusal to grant certain instructions for the defendant and that the jury's verdict was against the overwhelming weight of the evidence.
Prior to her death Paulette McHale, hereinafter Paulette, and the appellant were married. On Sunday, June 18, 1972, they separated and during the early morning hours of the following Friday Paulette was shot and killed by her husband.
On the evening of June 22, 1972, Paulette was taken to Henry's Lounge, her place of employment, by Mrs. Mildred Herndon, her mother. At approximately midnight they left the lounge and drove to the 45 Truck Stop restaurant and found it to be closed for the evening. While there, they met Henry Arnold, a truck driver, and were accompanied by him to another restaurant where they had dinner. Upon returning with Arnold to the 45 Truck Stop they were accosted by McHale who accused Arnold of making love to his wife. There followed a verbal exchange between the two which culminated in, according to a state witness, McHale exclaiming that he would get Paulette. McHale then left the premises and Paulette accompanied her mother to the latter's home.
Richard Goodwin, a brother of Paulette, arrived at his mother's home simultaneously with the arrival of Paulette and her mother. Immediately thereafter, according to the evidence, McHale appeared, stating, "Paulette, you are going to talk to me now," and struck her upon the shoulder. Goodwin then stepped between Paulette and McHale, but retreated when he was warned by McHale that he had a gun and would kill him. At this time Mrs. Herndon, according to her version, struck the appellant upon the arm with a soft drink bottle to knock a gun from his hand. McHale's version of the occurrence was that he had no gun in his hand, but after being struck, drew a gun from his pocket for the purpose of protecting himself. In either event he shot Mrs. Herndon in the arm. Goodwin then ran into the house for the avowed purpose of obtaining a gun with which to kill McHale. Immediately thereafter McHale shot his wife in her left chest and three additional times in the back as she was falling or after she had fallen. His testimony concerning the shooting was:
I was scared for my life. We had been having trouble before that, and I  for about three months we hadn't talked to my mother-in-law, and then my wife had to call the police department on my brother-in-law to keep them away from the house.
* * * * * *
When I  When I  When I  After I was hit that night and threatened, I started shooting and I was running.
* * * * * *
Q. You telling these ladies and gentlemen of the jury, now, when Mrs. Herndon came up, that you didn't have a gun in your hand?
A. No, sir.
* * * * * *
A. When she hit me and my brother-in-law just threatened me. She hit me in the left side of the head and shoulder.

*44 Q. What was your wife doing all this time?
A. She was standing by her mother.
Q. Did she have anything in her hand?
A. I don't know. I don't believe she did.
Q. Did she ever threaten you in any way?
A. I don't know.
McHale fled the scene after the shots were fired, but surrendered himself several days later. A statement made by McHale in the nature of a confession at the time he surrendered was properly admitted into the evidence. It is virtually the same as the quoted testimony and corroborates the testimony of the State's witnesses that McHale furtively observed his wife in her activities from early in the evening until her death the following morning.
The prime area of contradiction in the record is whether or not McHale had a gun in his hand at the time he was struck by Mrs. Herndon or whether it was drawn from his pocket subsequent to the blow. The crux of this controversy is reached by McHale's argument that Mrs. Herndon testified upon the preliminary hearing that the gun was not in his hand at the time of the blow, but on the trial in chief she testified to the contrary, thus impairing her credibility as a witness, and being deprived of the preliminary transcript he was prejudiced by his inability to graphically portray this contradiction to the jury.
We conclude McHale's contention that he was deprived of equal protection and due process under the United States Constitution in the absence of a state-afforded transcript of the preliminary hearing to be without merit. While it is true that the preliminary hearing in a criminal case has been held to be a critical stage in the legal proceedings requiring the aid of counsel [Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970)], nevertheless, we are of the opinion this determination should not be enlarged to include a transcript of the preliminary proceedings in the absence of statutory authority therefor and particularly so when it does not appear that the lack of the transcript prejudiced the defendant. See Williams v. Jasper, 287 Ala. 237, 250 So.2d 701 (1971), for a discussion and decision on this point. The case of Roberts v. LaVallee, Warden, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967), relied upon by McHale for reversal, held that the State of New York was constitutionally compelled to furnish an indigent with a free copy of a preliminary hearing transcript, but under circumstances quite different from those before us. There a New York statute provided for transcripts to be made available upon the payment of a fee. The acquisition of a transcript was therefore available to those financially able to purchase and unavailable to an indigent. Equality of justice was therefore dependent upon financial ability rather than the constitutional standard of equality under law. LaVallee is distinguished from this case since our state has no such statute. It therefore does not interpose financial consideration upon an indigent prisoner and his exercise of a state right to sue for liberty, his right being equal to others. Williams, supra.
Assuming, but not deciding, that a constitutional privilege of McHale was violated by the absence of a state provision for making a transcript, we nevertheless conclude that since the appellant's argument is directed to the credibility of a state witness in the face of other almost insurmountable state's evidence that if error, it was harmless. In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966), the United States Supreme Court pronounced that there may be some constitutional errors in the setting of a particular case which are so unimportant that they may, consistent with the Federal Constitution, be deemed harmless and not require an automatic reversal of a conviction. In applying *45 this rule we are of the opinion and assert our belief that the assumed error was harmless beyond a reasonable doubt.
The appellant contends that the trial court erred in granting the State an instruction which precluded the jury from considering his plea of self-defense.[1] He relies upon Herrington v. State, 177 Miss. 837, 172 So. 129 (1937), and Ferguson v. State, 242 So.2d 448 (Miss. 1970), as authority for his reasoning. An examination of these cases indicates clearly, we think, that they do not support this premise. In Herrington the condemned instruction concluded with the statement, "... Herrington cannot plead self-defense." An examination of the instructions in Ferguson reflects similar express language. The instructions read in part as follows:
1.
The Court instructs the jury that a person cannot intentionally provoke another person to attack him and then claim he reacted to the attack in self-defense.
2.
... the Court instructs the jury that Officer Dillard was not the aggressor when he struck the Defendant.
3.
... the Defendant cannot plead self-defense.
(242 So.2d at 449-450)
The present instruction, which we do not uphold as a model, nevertheless does not deprive the defendant of self-defense by its terms and when considered with the nine other instructions relating to self-defense, fairly portrays the law upon the subject for the jury's enlightenment and observation in conjunction with the evidence. We conclude the appellant was not prejudiced by the State's instruction assigned as error nor by the refusal of some instructions on self-defense requested by McHale. We do not mean by the above statements to indicate that the right to a plea of self-defense is in any wise diminished, Craft v. State, 271 So.2d 735 (Miss. 1973), but rather that there are ample instructions to cover the subject.
The argument is next advanced that the trial court erred in not instructing the jury that the appellant could only be found guilty of manslaughter under the factual situation extant at the time of the shooting. We believe it sufficient to state that the defendant did not avail himself of his right to have the jury instructed upon this issue and is not entitled to avail of it here. Gulf & Ship Island RR Co. v. Saucier, 139 Miss. 497, 104 So. 180 (1925).
Finally, the appellant urges that the verdict is against the overwhelming weight of the evidence. We have considered the record in great detail and conclude that there is no evidence, including that of the appellant, that his wife stated or did anything, either individually or in concert with others, indicative of harm to him. Indeed, a review of this record forces the statement that the jury would have been hard put to find other than guilty of murder.
Affirmed.
GILLESPIE, C.J., and SMITH, ROBERTSON and SUGG, JJ., concur.
NOTES
[1] The court instructs the Jury for the State that to make the shooting and killing a human being justifiable on the grounds of self-defense, the danger to the Defendant must be either actual, present and urgent, or the Defendant must have reasonable grounds to apprehend a design on the part of the person so shot and killed to kill him or to do him some great bodily harm, and, in addition to that, that there is imminent danger of such design being accomplished; and hence, mere fear, apprehension or belief, however sincerely entertained by one person that another designs to take his life or to do him some great bodily harm, will not justify the former in shooting and killing the other party. A party may have an apprehension that he is in danger, and believe the grounds of his apprehension just and reasonable, and yet he acts at his peril. The Defendant is not the final judge; the Jury may determine the reasonableness of the grounds upon which he acted.