592 So.2d 114 (1991)
Tracy Alan HANSEN
v.
STATE of Mississippi.
No. 89-DP-0823.
Supreme Court of Mississippi.
December 18, 1991.
*120 Dale Robinson, Gulfport, for appellant.
Mike C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.

ON PETITION FOR REHEARING
ROBERTSON, Justice, for the Court:

I.
We are confronted today with the senseless slaying of a veteran state trooper, to which the jury responded by sentencing the killer to die. What stands out on review is how few of the hundreds of rulings the trial judge made from beginning to end are open to credible question. At only two or three points are we seriously troubled that the defendant's substantial right to a fair trial may have been compromised, this though defense counsel has persistently put us through our paces. In this world where there are no perfect trials but where, when life is at stake, we seek trials as fair as is humanly possible  to the prosecution and the defense, the trial judge did about as well as may be done.
For the reasons set forth below, we affirm.

II.

A.
Tracy Alan Hansen was born in Florida on May 25, 1963, and then began the rest of his troubles. These included substantial abuse through a troubled childhood, frequent encounters with Florida's juvenile justice system and, between July, 1981, and October, 1984, at least ten felony convictions  eight property crimes and two escapes.
In the Spring of 1987, Hansen hooked up with Anita Louise Krecic, four years and a day his senior. On Friday, April 10, 1987, the two left Florida in a dark blue Lincoln Continental, and by approximately 6:30 p.m. they had made Mississippi and were traveling westward on Interstate Highway 10, Hansen driving, approaching the western boundary of Harrison County. This was the first week of Daylight Savings Time. The sun was shining.
David Bruce Ladner, eighteen years an officer of the Mississippi Highway Safety Patrol (MHSP), was assigned to the Gulfport Substation. On this Friday afternoon, he was patrolling I-10 in Harrison County when he encountered the dark blue Lincoln Continental and observed erratic driving and speeding. Trooper Ladner pulled in behind the vehicle and signaled to the driver to pull over, which he did. Apparently at the time, Trooper Ladner foresaw nothing more serious than a traffic offense, at worst a driving-while-intoxicated. Once he had the vehicle stopped  on the north side of the road for westbound traffic  Trooper *121 Ladner began to suspect more and asked permission to search the car. Hansen and Krecic signed a Consent to Search form, giving fictitious names, Christopher Larcinesse and Barbara Gilbert. In the process, Ladner took the keys to the Continental and placed them in his pocket.
It is unclear exactly what happened next, but, at some point, Hansen drew a .38 caliber pistol and shot at Trooper Ladner. To avoid the fire, Ladner ran around the car and dropped to the ground, in an apparent attempt to roll underneath. Hansen managed to get off two shots at close range, each striking Ladner in the back. Still, Ladner managed to get up and make it to the median strip, where Charles Shirley, fortuitously driving through at the moment, picked him up and took him to the hospital. Ladner died some thirty-one (31) hours later  on early Sunday morning, April 12, 1987  still in the hospital.
A number of motorists passing by the area observed bits and pieces of what happened. These included William Forrest Runnels, a sales representative from Sims, Alabama; Paul Tibbetts, a pharmacist from Baton Rouge, Louisiana; Donald Ray Meche, district manager for Seacorp. Industries from Mobile; Steve Diaz, a Gulf Coast resident; Sonya Burt, a seventeen-year old traveling with her parents, Janet and Frank Burt; Marla Kelly, another seventeen-year old; Jack Briar; Charles E. Childress; Debbie Butler, a legal secretary in Biloxi; Amanda Davis, another seventeen-year old; Laura Migues; her traveling companion, Jack McDermott; and, of course, Charles Shirley. Kathy Ann Romany, a resident of Marguerite, Florida, had been traveling west on I-10 at about the same time and had noticed the blue town-car from about Pensacola on and identified Hansen as the driver. Tibbets, Meche, and Diaz identified Hansen as the man they had seen on the side of the road on Friday evening, April 10, and Tibbetts and Meche said they saw Hansen shoot Trooper Ladner.
Hansen and Krecic, having been relieved of the keys to their car, fled the scene in Ladner's Highway Patrol car. They took the first exit north off I-10 and immediately pulled over a 1984 silver metallic Ford Ranger driven by Daisy Morgan, a deaf-mute. Hansen and Krecic stole Morgan's vehicle, leaving Morgan and the Patrol car on the side of the road. Morgan, who could see quite well, later identified Hansen as the man who stole her Ranger.
Over the next several hours, Hansen and Krecic sought assistance from various Hancock County residents, presenting assorted tales of woe, the bottom line in each instance being that they wanted transportation to New Orleans. After midnight, Hansen and Krecic were still in Hancock County and made their way to the home of Pat Ladner and his family on Rocky Hill Road, in the apparent company of the Ladners' brother-in-law, Jody Wade, and Charlie Williams. Some thirty minutes later, Wade and Williams agreed to take Hansen and Krecic to Waveland to find a motel room. En route they were stopped by State Troopers Freddie Keel and Darryl Deschamp, and Hansen and Krecic were taken into custody.
Hansen and Krecic were initially charged with two counts of grand larceny, no doubt referring to the two vehicles they had stolen, and Hansen was charged with aggravated assault on a law enforcement officer. When Trooper Ladner died the next day, these charges were elevated to capital murder.

B.
On May 28, 1987, the grand jury of Harrison County, Mississippi, returned an indictment charging Tracy Alan Hansen with the capital murder of David Bruce Ladner, a peace officer with the Mississippi Highway Safety Patrol who was acting in his official capacity and that the killing occurred at a time when Hansen knew of that capacity. Miss. Code Ann. § 97-3-19(2)(a) (Supp. 1987). The indictment charged as well that Hansen was an habitual offender. Miss. Code Ann. § 99-19-81 (Supp. 1987). Extensive pre-trial proceedings followed, and the Circuit Court, by reason of pre-trial publicity, ordered venue changed to Hinds County.
*122 On October 26, 1987, the Court called the case for trial sitting in Jackson, Mississippi. In due course, the jury returned a verdict that Hansen was guilty as charged. Thereafter, the trial entered the penalty phase, and, in the end, the jury returned a verdict providing, inter alia,
We, the jury, unanimously find that the aggravating circumstances of:
1. The capital offense was especially heinous, atrocious or cruel, and
2. The capital offense was committed for the purpose of avoiding or preventing lawful arrest, or effecting an escape from custody[,]
are sufficient to impose the death penalty, and we unanimously find beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating circumstances and we unanimously find beyond a reasonable doubt that the defendant should suffer the penalty of death.
See Miss. Code Ann. § 99-19-101 (Supp. 1987).
The Circuit Court thereupon sentenced Hansen to death by lethal injection. Miss. Code Ann. § 99-19-51(1) (Supp. 1987). This appeal has followed.

GUILT PHASE

III. Preliminary Hearing

Hansen argues that the Circuit Court erred when it denied his motion for a preliminary hearing. The record reflects Hansen filed his motion on June 16, 1987. This was almost three weeks after the grand jury had indicted Hansen. The Circuit Court originally took the matter under advisement. After four days of pre-trial hearings during the course of which most of the witnesses who later appeared at the trial were produced, examined and cross-examined, the Circuit Court denied the motion saying:
I'm not granting a preliminary  because as I say, you've got all of the D.A.'s files, all of the investigative work that's been done on this case and certainly as I say, you have had a prima facie case presented here with the exception of venue and a pathologist. There's just no need for it, and I take it as part of the investigative files, you have whatever medical records the D.A.'s office has[,] is that correct?
On October 6, 1987, the Court entered a formal order denying Hansen a preliminary hearing.
The Mississippi Uniform Criminal Rules of Circuit Court Practice have for over ten years mandated preliminary hearings for those accused of crimes. Rule 1.04(3) directs the judicial officer who handles the initial appearance[1] to advise the accused of his right to a preliminary hearing and to set a date for such "within a reasonable time." Rule 1.07 then mandates that the "preliminary hearing shall be heard by a judicial officer on the date set for such hearing at the defendant's initial appearance." The hearing, of course, may be held before any judicial officer, including a justice court judge or a municipal court judge. In Avery v. State, 555 So.2d 1039 (Miss. 1990), we held that Rules 1.04 and 1.07 mean what they say  nothing more, nothing less.
Rule 1.04(3) provides that the accused may waive preliminary hearing in writing or in open court upon the advice of counsel. Avery held as well that the right the Rule confers is subject to a harmless error analysis. In that case, complaint of denial of a preliminary hearing was raised on the appeal of defendant's conviction following a second trial, a setting in which he had the benefit of one complete trial (which had resulted in a hung jury and access to all "discovery" that first trial may have afforded). In consequence we held the error *123 in denying defendant's motion for a preliminary hearing "harmless beyond a reasonable doubt." Avery v. State, 555 So.2d at 1043.
In today's case, Hansen says he was prejudiced in but one particular: that he did not have an opportunity prior to trial to question the medical examiner on the cause of Ladner's death. Our review of the record, however, suggests that defense counsel had substantial access to all medical information regarding Hansen's treatment in Gulfport Memorial Hospital. Nothing before us suggests the medical examiner refused to talk with Hansen or his counsel outside the formal setting of the courtroom. Moreover, the Court made the new State Medical Examiner, who had no connection with the case, available to the defense for assistance and consultation on this issue.
The preliminary hearing rule affords an accused no right of discovery, and we say this notwithstanding common knowledge that over the years accuseds have used preliminary hearings as occasions for discovery. Avery v. State, 555 So.2d at 1042; see Willie v. State, 585 So.2d 660, 670 (Miss. 1991). Hansen's right to discovery is controlled by Rule 4.06. It is at best a by-product of Rule 1.07. For present purposes, we find that the grand jury process leading to indictment, coupled with the four-day pre-trial hearings, afforded Hansen substantially all the benefits, including discovery, he may reasonably have expected at a preliminary hearing. Hansen's pre-trial access to what the witnesses knew and remembered is only slightly less than that enjoyed by Randy Avery prior to his second trial.
The Circuit Court erred when it denied Hansen's motion for a preliminary hearing. Under the facts and circumstances of this case, and on the authority of Avery v. State, we hold that error harmless beyond a reasonable doubt. See Willie v. State, 585 So.2d 660, 671 (Miss. 1991).

IV. Transcript of Hearings On Pre-Trial Motions

On June 16, 1987, Hansen moved the Court for an order requiring the court reporter to transcribe the proceedings on the various pre-trial motions. He sought particularly the testimony of anticipated trial witnesses and asked that he might have such in time that he might effectively use it in trial preparation. The Court denied the motion, stating that the court reporter's time was so occupied with other duties that Hansen's request, if honored, would impose a substantial and unreasonable burden. On the other hand, the Court noted that the reporter used a "backup taping system" and that "this whole set of hearings has been done by cassette." The Court advised counsel that it would make the tapes available to them and would
enter an order to allow you to tape the tapes and listen to them ... all of it ... that will give you the entire transcript, the truth of the matter is, if you want it.
The record reflects an agreement to give the tapes to Hansen's lawyers on Wednesday afternoon, September 16, 1987, and that they would be returned to the Court on Friday of that same week.
In Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), the Supreme Court read the Constitution to require that, upon request, the state must furnish an indigent defendant a transcript of "prior proceedings when that transcript is needed for an effective defense or appeal." Britt, 404 U.S. at 227, 92 S.Ct. at 433, 30 L.Ed.2d at 403. This view is a function of the accused's right to the equal protection of the laws. See also, Bounds v. Smith, 430 U.S. 817, 822 n. 8, 97 S.Ct. 1491, 1495 n. 8, 52 L.Ed.2d 72, 79 n. 8 (1977); San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 21, 93 S.Ct. 1278, 1290, 36 L.Ed.2d 16, 35-36 (1973). Need is the key, and Britt identifies two factors as bearing on need: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." Britt, 404 U.S. at 227, 92 S.Ct. at 434, 30 L.Ed.2d at 403-04. Of late, we have made it clear that we take seriously both Britt and the principle it expounds. Lewis v. State, 580 So.2d *124 1279, 1285 (Miss. 1991); Fielder v. State, 569 So.2d 1170, 1172-73 (Miss. 1990); see also, Ruffin v. State, 481 So.2d 312, 315 (Miss. 1985).
The indigent defendant's Britt right to a free transcript of prior proceedings has been held to include preliminary hearings in some jurisdictions, although this Court has never done so. The Supreme Court of Colorado has written:
A preliminary hearing transcript can be of great value to a defendant at trial. It is a "vital impeachment tool for use in cross-examination of the State's witnesses" and for trial preparation in general. [citations omitted] As a practical matter, the transcript must be available to defense counsel prior to the trial if it is to be useful as an impeachment and trial preparation tool. [citations omitted] The defendant's lawyer should not be forced to rely on his memory of the preliminary hearing, or notes prepared at the hearing, to establish inconsistencies between testimony at the hearing and at trial. [citations omitted] Providing the preliminary hearing transcript for the first time at trial is thus not an adequate alternative to providing the transcript before the trial. [citations omitted]
Gonzales v. District Court In and For The County of Weld, 198 Colo. 505, 602 P.2d 857, 858 (1979). The Gonzales Court limited its holding to those cases in which the defendant pleaded not guilty and there was a reasonable assurance the state's witnesses at the preliminary hearing would also testify at trial. See also, United States ex rel. Moore v. People of Illinois, 577 F.2d 411 (7th Cir.1978) (error in failure to provide transcript of the preliminary hearing in which an allegedly suggestive confrontation between rape victim and defendant occurred, but error found harmless beyond a reasonable doubt); McMillion v. State, 742 P.2d 1158 (Okla. Crim. App. 1987) (denial of a free transcript of the preliminary hearing to an indigent represented a substantial violation of a constitutional right.) See also, Graham v. State, 757 S.W.2d 538, 541 (Ark. 1988); Gardner v. State, 754 S.W.2d 518, 524 (Ark. 1988); State v. Lewis, 215 N.W.2d 293, 295 (Iowa 1974); Hawkins v. State, 486 P.2d 743 (Okla. Crim. App. 1971); People v. Montgomery, 18 N.Y.2d 993, 224 N.E.2d 730, 278 N.Y.S.2d 226 (1966).
All of this would seem to call into serious question this Court's decision in McHale v. State, 284 So.2d 42 (Miss. 1973), wherein we upheld a circuit court's denial of an indigent's request for a transcript of a preliminary hearing. On the other hand, we find dispositive today the fact that the Circuit Court ordered the tapes of the hearing provided to defense counsel, and the record reflects arrangements wherein the tapes were, in fact, made available. We hold that the court reporter's tapes are the substantial equivalent of the transcript and satisfy Britt's articulation of the accused's entitlement in the premises. See also, Lewis v. State, 580 So.2d 1279, 1285 (Miss. 1991).

V. Viewing the Scene of the Crime

On June 16, 1987, Hansen moved that he be allowed, in preparation for trial, to accompany his lawyers to view the scene of the crime. The Court originally determined to grant this motion but, as a result of being notified by a police officer that twice during lunch Hansen had slipped out of his handcuffs, rescinded its ruling. The Court said it might reconsider at a later date upon a showing of substantial need. On appeal, Hansen charges error in the Court's refusal to allow him to visit the scene of the crime with his lawyers.
Matters such as this are committed to the sound discretion of the Circuit Court. Miss. Code Ann. § 13-5-91 (1972); cf. Tolbert v. State, 511 So.2d 1368, 1378 (Miss. 1987). In cases where the defendant shows substantial need and where adequate security measures are available, the Circuit Court has authority to grant such a motion. Hansen has presented no facts in the record nor argument on appeal substantially suggesting his defense may have been impeded by the Court's refusal to allow him to visit the crime scene. Under the circumstances, we may not hold the Circuit Court abused its discretion in the premises.

*125 VI. Independent, State-Funded Investigator

Relying on Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), Hansen contends he was denied the equal protection of the laws, due process of law, and effective assistance of counsel by the Circuit Court's denial of his requests for appointment of and/or funds with which to employ an independent investigator.
The criminally accused have made such motions for some time now, and we initially responded with measured skepticism. See, e.g., Davis v. State, 374 So.2d 1293, 1297 (Miss. 1979); and Bright v. State, 293 So.2d 818, 822 (Miss. 1974). We recognized that there may be instances, when in fairness, the state should be required to provide and pay for non-legal personnel needed by the defense, and we committed to the circuit court the discretionary authority to identify such cases and make such orders as may be appropriate. Billiot v. State, 454 So.2d 445, 453-54 (Miss. 1984); Ruffin v. State, 447 So.2d 113, 118 (Miss. 1984); Bullock v. State, 391 So.2d 601, 607 (Miss. 1980).
The Supreme Court broadened these premises with Ake in 1985. Still, in the same term, the Court reiterated that the Constitution does not require the state to furnish an investigator absent a showing of substantial need. Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); see also, Johnson v. State, 529 So.2d 577, 589 (Miss. 1988). The accused is required to offer concrete reasons for requiring such assistance, not "undeveloped assertions that the requested assistance would be beneficial... ." Caldwell v. Mississippi, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231, 236 n. 1 (1985). No such need was shown in Pinkney v. State, 538 So.2d 329, 343 (Miss. 1988), vacated on other grounds, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990), and we affirmed. Griffin v. State, 557 So.2d 542, 550-51 (Miss. 1990), is to like effect.
The Court below asked that Hansen provide the name and the proposed cost of the investigator, and a specification of purposes for which the investigator was needed. The Court allowed Hansen until the following Tuesday to gather the information. Hansen suggested a man named Ralph Paz, who would charge $15.00 per hour plus expenses, but he never came forward with the remaining predicate facts and circumstances and never again raised the issue, until this appeal. The Court below noted that Hansen had heard most of the witnesses testify, preliminarily though rather fully, knew the substance of what each witness knew, and that they were, for the most part, local people. The prosecution had provided Hansen with the statements given by the witnesses, and Hansen's lawyer had been able to cross-examine them during the pre-trial hearings. There were a few witnesses located in Florida that had not been presented at the pre-trial hearing, and the Court stated it did not see why they could not be contacted via telephone and interviewed. In this light, we cannot say the Circuit Court abused its discretion in denying Hansen funds for an independent investigator.

VII. Independent, State-Funded Pathologist

Hansen further invokes Ake and charges error in the Circuit Court's refusal to provide him the assistance of an independent pathologist. Williams v. Martin, 618 F.2d 1021, 1026-27 (4th Cir.1980), suggests that, on a showing of substantial need, such a request may have merit.
Hansen says he needed this assistance in order to show an intervening cause of Trooper Ladner's death in the form of medical malpractice at the hospital. The Circuit Court denied the motion, offering Hansen an alternative resource. The Court ordered Mississippi's new medical examiner, who played no prior part in this case, to review the records and provide a report whether there was a possible intervening cause of death. Then, the Court said, if the defense's malpractice theory appeared viable, it would favorably consider the motion. Hansen declined to accept this assistance. In light of the Court's offer and Hansen's declination, coupled with the lack of a substantial evidentiary *126 basis for Hansen's claim of need, we hold this issue without merit.

VIII. Fruits of the Search Incident to Arrest

On August 31, 1987, Hansen filed a motion to suppress, challenging the prosecution's right to use as evidence the fruits of the search incident to his arrest on the early morning hours of April 11, 1987. As grounds, Hansen argued, inter alia, that Officers Keel and Deschamp had no authority to stop and arrest him at the time. Of particular concern to Hansen are the two guns the officers seized, incident to the arrest: (1) a .38 caliber handgun  the bullet removed from Trooper Ladner's neck had been fired from a .38 caliber gun, and (2) the MHSP standard issue.357 magnum, checked out to Trooper Ladner. Both were found in the car in which Hansen was riding at the time of his arrest. These facts given the jury no doubt devastated the defense. Hansen renews the argument on appeal.
The point may be quickly dispatched. It will be recalled that Hansen and Krecic had left the Pat Ladner home riding with Jody Wade and Charles Williams in Williams' Ranchero. They had gone through the roadblock manned by Officers Keel and Deschamp, and, shortly thereafter, Randall Ladner and Wesley Ladner had approached the officers and told them that there were in the vehicle a young man and woman, whom the officers quickly realized may well be their suspects. Officers Keel and Deschamp took off in hot pursuit and soon caught and detained the Ranchero, placed Hansen and Krecic under arrest and searched the vehicle.
The Circuit Court found that the officers had probable cause for both the arrest and search and subsequent seizures. These findings are supported by substantial evidence. Turner v. State, 573 So.2d 657, 665 (Miss. 1990); Nathan v. State, 552 So.2d 99, 103 (Miss. 1989); Woodward v. State, 533 So.2d 418, 426 (Miss. 1988); West v. State, 463 So.2d 1048, 1056 (Miss. 1985). Alternatively, the search and seizures were permissibly incidental to Hansen's arrest. We affirm.

IX. Individualized, Sequestered Voir Dire

Before trial, Hansen moved for individual sequestered voir dire examination of the prospective jurors. The Circuit Court deferred ruling on the motion and instead sent to all prospective jurors a questionnaire designed to elicit a wealth of information. The Court explained that, if thereafter there appeared a need to question individual jurors outside the presence of the others, such would be allowed. The Court never granted the motion.
Rule 5.02, Miss.Unif.Crim.R.Cir.Ct. Prac. (1979) addresses the manner in which the court should conduct voir dire of prospective jurors.
In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court... .
We do not read Rule 5.02 as prohibiting a circuit court from utilizing individualized, sequestered voir dire. In its discretion, the court may allow it. Jones v. State, 461 So.2d 686, 692 (Miss. 1984). We have held, however, that Rule 5.02 does not require more than by its terms it requires. White v. State, 532 So.2d 1207, 1218 (Miss. 1988); Lutes v. State, 517 So.2d 541, 547 (Miss. 1987); West v. State, 463 So.2d 1048, 1054 (Miss. 1985); see Gilliard v. State, 462 So.2d 710, 714 (Miss. 1985).
The Circuit Court was within its discretion in its handling of this matter. We decline reversal.

X. A Batson Issue

Hansen argues that the Circuit Court erred when it denied his motion to preclude the prosecuting attorney's use of peremptory challenges to exclude black persons from the jury. He cites Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). He complains specifically that the Court excluded prospective juror, Courtenay Stringer, said to be a black *127 person. Hansen says he is entitled to the benefit of Batson even though he is of the white or Caucasian race, and in his fundamental premise he is right.[2]Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).
The short answer is that nothing in the record suggests the race of juror Stringer or any of the jurors the prosecution challenged peremptorily. Although defense counsel was given permission to include in the record the questionnaires of the jurors the prosecution struck, we have found no questionnaires.
It is elementary that a party seeking reversal of the judgment of a trial court must present this Court with a record adequate to show that an error of reversible proportions has been committed and that the point has been procedurally preserved. (citations omitted)
Queen v. Queen, 551 So.2d 197, 199 (Miss. 1989). This Court "must decide each case by the facts shown in the record, not assertions in the brief... ." Burney v. State, 515 So.2d 1154, 1160 (Miss. 1987) (quoting Mason v. State, 440 So.2d 318, 319 (Miss. 1983)). The burden falls upon an appellant to ensure the record contains "sufficient evidence to support his assignments of error on appeal." Burney, 515 So.2d at 1160 (quoting Robinson v. State, 345 So.2d 1044, 1045 (Miss. 1977)). In the present state of the record, we may not credit this charge of error.

XI. Witherspoon, With a Twist

Hansen argues that the Circuit Court erred when it refused his lawyer's request for voir dire examination of two prospective jurors who had stated their opposition to the death penalty. The issue implicates the familiar rule of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and progeny, but with a twist. Today's question is not so much whether the Circuit Court erroneously excluded jurors who in law were competent and eligible to serve but whether, procedurally, the Circuit Court had authority to exclude the jurors without allowing defense counsel the opportunity to question them.
What happened is this:
THE COURT (addressing the entire panel): Do any of you have any conscientious scruples against the infliction of the death penalty when the law authorizes it and allows it as it does in this case, and the facts of the case justify it?
Three jurors responded they did. The responses of the two jurors here at issue are as follows:
MS. HULITT: Yes, sir. I'm also a nurse, and I don't think I could vote to put someone to death.
THE COURT: Are you opposed to the death penalty?
MS. HULITT: Yes, sir.
.....
THE COURT: Could you set aside  do you think you could set aside those convictions and nonetheless try the case and, if necessary, based upon the facts and the law vote to impose a death sentence?
MS. HULITT: No, sir.
THE COURT: Under no circumstances?
MS. HULITT: If I had to vote for the death penalty, I couldn't.
THE COURT: Okay?
MS. HULITT: No, sir.
.....
THE COURT: Okay. Miss Hulitt, the same question: Are you telling me that you would automatically vote against the death penalty?
MS. HULITT: Yes, sir.
THE COURT: Under any circumstances?
MS. HULITT: Yes, sir.
* * * * * *
MS. NICHOLS: Sir, I'm just  I'm opposed  I'm against taking somebody else's life. I just couldn't sleep at night or deal with it.
THE COURT: Under no circumstances?

*128 MS. NICHOLS: Under no circumstance. I'm too scared.
THE COURT: At all?
MS. NICHOLS: At all.
THE COURT: Are you telling me, Miss Nichols, that if you were, in fact, selected to sit on the case and the jury reached a guilty verdict, that you would automatically vote against the death penalty?
MS. NICHOLS: Yes, sir, because I'm against the taking of somebody else's life.
Following these colloquys, the Circuit Court ordered jurors Nichols and Hulitt excused. Defense counsel immediately spoke up: "We would ask an opportunity to voir dire them." The Circuit Court denied the request and finally discharged the jurors.
Several of Witherspoon's substantive parameters need be noted. For one thing, exclusion is permissible though the juror's opposition is less than unequivocal, her vote against death less than automatic. The court may exclude the juror where it
is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.
Wainwright v. Witt, 469 U.S. 412, 424-25, 105 S.Ct. 844, 852-53, 83 L.Ed.2d 841, 851-52 (1985); Pinkney v. State, 538 So.2d at 345. On the other hand, mere personal opposition to capital punishment does not render incompetent a juror who nevertheless states under oath that he or she is "temporarily [willing to] set aside ... [his or her] own beliefs in deference to the rule of law." Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137, 149-50 (1986).
It is in this context that Fuselier v. State, 468 So.2d 45 (Miss. 1985), and other cases have emphasized the importance of voir dire in fully developing a juror's views regarding the death penalty. We have directed that, notwithstanding a prospective juror's scruples, the court should inquire further whether the juror would follow its instructions and a fair verdict render according to the law and the evidence. Gray v. State, 472 So.2d 409, 421 (Miss. 1985), reversed on other grounds, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987).
Historically, the procedural authority for this inquiry derived in part from Miss. Code Ann. § 13-5-69 (1972), which at the time of trial provided:
The parties or their attorneys in all jury trials shall have the right to question jurors who are being impaneled with reference to challenges for cause, and for peremptory challenges, and it shall not be necessary to propound the questions through the presiding judge... .[3]
We have recognized in Phenizee v. State, 180 Miss. 746, 753-54, 178 So. 579, 581-82 (1938), that this rule means what it says. Of late, we have promulgated procedural rules contemplating voir dire examination by attorneys. See Rule 3.02, Miss.Unif.Cir. Ct. Rules (1979),[4] and Rule 5.02, Miss.Unif. Crim.R.Cir.Ct.Prac. (1979).[5] To be sure, we have directed that the Circuit Court take a substantial role in conducting Witherspoon voir dire of prospective jurors in a capital case, see Gray v. State, 472 So.2d at 421; *129 Pinkney v. State, 538 So.2d at 345; Lockett v. State, 517 So.2d 1317, 1335 (Miss. 1987); Fuselier v. State, 468 So.2d at 53-54, but this does not mean counsel have no role.
We have considered this issue with some care. There appears no escape from the fact that the Circuit Court erred when it denied counsel's request for voir dire examination of jurors Hulitt and Nichols. See Burns v. Estelle, 592 F.2d 1297, 1301 (5th Cir.1979), on reh'g, 626 F.2d 396 (5th Cir.1980) (en banc). On the other hand, the answers these two jurors gave are substantially clear, and it appears reasonably certain that each was Witherspoon-excludable. As we may do, we afford a measure of deference on this point to the court that saw and heard these jurors. Wainwright v. Witt, 469 U.S. at 426, 105 S.Ct. at 853, 83 L.Ed.2d at 853; Woodward v. State, 533 So.2d 418, 424 (Miss. 1988). Speculating, but with the aid of a touch of common sense, we regard the likelihood that voir dire examination by defense counsel would have rehabilitated these jurors sufficient to take them out of Witherspoon is, on this record, rather slim. We hold the error harmless beyond a reasonable doubt and that, as such, it does not require reversal.
Beyond this, and more substantively, we hold jurors Hulitt and Nichols Witherspoon-excludable. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); Wainwright v. Witt, 469 U.S. at 424-26, 105 S.Ct. at 852-53, 83 L.Ed.2d at 851-53; Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); Turner v. State, 573 So.2d 657, 666-67 (Miss. 1990).

XII. Another Juror Challenged for Cause

Related to the preceding issue, Hansen charges error in the Circuit Court's order excusing juror Garrison for cause. Juror Garrison had stated that she had ambiguous feelings about the death penalty but when asked directly if she was opposed to it, answered, "No, ... not personally." In answer to the question, could she, under appropriate circumstances, vote to impose the death penalty, Garrison answered, "Honestly, I don't know whether I could." Hansen says this is insufficient to exclude her under Witherspoon.
As we see it, the record reflects the Circuit Court excusing juror Garrison for an entirely different reason. The Court asked if there was anything on her mind that might affect her ability to focus on the proceedings in court, and juror Garrison answered:
It's on my mind. It would probably stay on my mind. I been [sic] married a week and we're in a new house. That would be on my mind.
This may not have been the most impressive reason a court credited in releasing a prospective juror, but we do not find it impermissible under Witherspoon or otherwise. Cf. Chisolm v. State, 529 So.2d 635, 638-39 (Miss. 1988). In these circumstances, we hold the Circuit Court acted within its discretion when it excluded juror Garrison. See Miss. Code Ann. § 13-5-79 (1972); Burt v. State, 493 So.2d 1325, 1327 (Miss. 1986); Gilliard v. State, 428 So.2d 576, 580-81 (Miss. 1983).

XIII. Failure to Use All Peremptory Challenges

Hansen complains that the Circuit Court erred when it denied his challenges for cause to four jurors, Harold Woodward, Polly Adams, Maxine Conduit and Anley McClean. The circumstances of each are somewhat individual, but the answers to each claim have a common origin. The law afforded Hansen twelve peremptory challenges. Miss. Code Ann. § 99-17-3 (1972). He exercised but seven  three being used on jurors Woodward, Adams and Conduit.
Our settled rule requires that, before an appellant may challenge a trial court's refusal to excuse a juror for cause, he must show that he utilized all of his peremptory challenges. See, e.g., Berry v. State, 575 So.2d 1, 9 (Miss. 1990); Chisolm v. State, 529 So.2d 635, 639 (Miss. 1988); Johnson v. State, 512 So.2d 1246, 1255 (Miss. 1987); Billiot v. State, 454 So.2d, 445, 457 (Miss. 1984). The reason for the rule is that the appellant has the power to cure substantially *130 any error so long as he has remaining unused peremptory challenges. We would put the integrity of the trial process at risk were we to allow a litigant to refrain from using his peremptory challenges and, suffering an adverse verdict at trial, secure reversal on appeal on grounds that the Circuit Court did not do what appellant wholly had power to do.
Hansen merits no relief on this issue.

XIV. Timing of Ruling on Admissibility of Hansen's Prior
 
Convictions
Hansen argues that the Circuit Court erred when it refused to make a pre-trial ruling regarding the admissibility of his prior convictions. He points to his right to testify in his defense and says the Court's refusal to rule preliminarily impermissibly chilled his exercise of that right. The record reflects that prior to the trial at issue, Hansen had at least ten felony convictions arising out of the State of Florida  eight property crimes and two escape offenses.[6] He notes that none of these is a crime of violence, without explaining the legal import of the point.
The issue arises under Rule 609(a), Miss. R.Ev.[7] which provides, with respect to convictions such as Hansen's, that the court may admit any one or more for impeachment if it determines the conviction has probative value on the issue of the accused's credibility and that such value outweighs its prejudicial effect. See McInnis v. State, 527 So.2d 84, 88-89 (Miss. 1988). Hansen's concern is one of strategy, one we have addressed in the past. The accused wants to know in advance whether the prosecution may use his prior convictions so that he can then decide whether to take the witness stand in his own defense. In a case such as this, quite apparently, the prospect of these convictions being used for impeachment has a substantial deterrent effect upon the accused's contemplation whether he will in fact testify. See United States v. Cook, 608 F.2d 1175, 1184 (9th Cir.1979).
*131 Following the lead of the federal judiciary interpreting a like provision in the Federal Rules of Evidence, we adopted a discretionary approach. The circuit courts certainly have authority to address Rule 609 questions prior to trial. See e.g., Saucier v. State, 562 So.2d 1238, 1244-46 (Miss. 1990); McGee v. State, 569 So.2d 1191, 1194-97 (Miss. 1990). Of late we have encouraged them to do so, where feasible, Settles v. State, 584 So.2d 1260, 1264 (Miss. 1991).
We decide the question on a note of appellate procedure. In Saucier we stated:
[a]t the very least, a defendant wishing to present the point on appeal, absent having taken the witness stand himself, must preserve for the record substantial and detailed evidence of the testimony he would have given so that we may gauge its importance to his defense.
Saucier, 562 So.2d at 1245. Hansen did not meet this burden. He thus affords us no basis for concluding that the Circuit Court abused its discretion in declining to rule preliminarily upon the admissibility of his prior convictions.

XV. Procedure Incident to Change of Venue

Prior to trial, Hansen moved for a change of venue, and the Circuit Court ordered the case transferred to Hinds County, Mississippi. In his motion for a new trial, Hansen argued that the Court had acted improperly when it proceeded to try the case in Hinds County because a certified copy of the indictment had never been transmitted to the new venue as required by statute. Miss. Code Ann. § 99-15-37, -39, -41 (1972). He renews the point here.
We find the deficiency a technical one, wholly subject to waiver if not timely asserted. Section 99-15-39 provides "[d]efects in the transcript shall not avail the accused if he [does] not object to them specifically before trial." Moreover, Section 99-15-41 reads:
Miss. Code Ann. § 99-15-41. Change of venue  correcting errors in record.
On suggestion to the court, with satisfactory showing, it may order a more perfect record to be made and certified, or direct the clerk making the same to rectify any errors therein.
We hold that Hansen waived any claims he may have in the premises by not asserting them prior to trial and, in the alternative, that the Circuit Court cured any error under the authority of Section 99-15-41.

XVI. Demonstrative Evidence

Hansen argues that the Circuit Court erred when it allowed prosecution witness Steve Diaz to leave the witness stand and demonstrate or re-enact for the jury the movements he says he saw Trooper Ladner make on the day of the shooting, "to leave the stand and roll around on the floor," as Hansen puts it. He cites Goggins v. State, 529 So.2d 649 (Miss. 1988).
We call such evidence "demonstrative evidence," and our law has long held it admissible in the trial court's sound discretion, if "appropriate and relevant," Gandy v. State, 373 So.2d 1042, 1047 (Miss. 1979) (citing Baggett v. State, 219 Miss. 583, 69 So.2d 389 (1954), for it is common experience that many witnesses act out more accurately than they verbalize. Murriel v. State, 515 So.2d 952, 956 (Miss. 1987), notes this view has been carried forward into the Mississippi Rules of Evidence, particularly Rules 401, 402, and 403.
Demonstrations by a witness of physical actions of another, personally observed by the witness, are allowed in other jurisdictions. In State v. Anderson, 171 Mont. 188, 557 P.2d 795 (1976), the witness, a patrolman, was allowed to demonstrate to the jury the manner in which the defendant had walked when the patrolman arrested him. Since the officer had adequate opportunity to observe the defendant walking when he was arrested, still had a good recollection of it at the time of trial, and the defendant was allowed the opportunity to cross-examine the witness, the trial court committed no error by allowing the demonstration. Anderson, 557 P.2d at 797.
*132 Assuming the Circuit Court applies the correct legal standard, we review such points for abuse of discretion. "[U]less that discretion is so abused as to be prejudicial to the accused," this Court will not disturb the trial court's ruling on appeal. Corley v. State, 536 So.2d 1314, 1318 (Miss. 1988); Burt v. State, 493 So.2d 1325, 1326 (Miss. 1986); Johnson v. State, 476 So.2d 1195, 1207 (Miss. 1985). Nothing in Goggins is to the contrary. In Goggins the prosecuting witness left the witness stand and walked over to the defendant and made a dramatic in-court identification. This is a far cry from the re-enactment Diaz provided at the trial below. Nothing before us suggests the Circuit Court erred or otherwise abused its discretion in the premises.

XVII. Court's Comments on Expert's Qualifications

Hansen charges that the Circuit Court erred in comments made upon the qualifications of the prosecution's forensic scientist, Joe Andrews. In accepting Andrews as an expert and overruling defense' objection to his qualifications, the Court stated:
I note your objection for the record. I consider him well qualified. And I think he can testify as an expert. I've approved him before myself. Overruled. Go ahead.
Hansen now argues that the Court's comment unfairly and thus impermissibly bolstered Andrews' qualifications and testimony.
We have considered the point and find it without merit. The law does not require that during the trial the judge behave as a deaf-mute. Stokes v. State, 548 So.2d 118, 125 (Miss. 1989); Haralson v. State, 314 So.2d 722, 724 (Miss. 1975); Bumpus v. State, 166 Miss. 276, 281, 144 So. 897, 898-99 (1932).

XVIII. Cross-Examination and the Confrontation Clause

A.
Hansen argues that the prosecution offended his rights under the Confrontation Clause(s) with its attempted cross-examination of Anita Krecic. He claims Krecic in practical effect testified against him, without his being able to confront and cross-examine her.
What happened is this: in his defense Hansen called Krecic as an adverse witness. She gave her name and address and then to all further questions pleaded her privilege against self-incrimination. When tendered for cross-examination, Krecic engaged in the following colloquy with the prosecuting attorney:
Q. Do you recall giving a statement to Sergeant Dean Shephard in Gulfport, Mississippi on April the 11th of this year?
A. I'm claiming the Fifth Amendment.
Q. Do you recall telling the officer that, quote, you know who did it, it wasn't me?
A. I'm claiming the Fifth Amendment.
Q. Do you remember that that answer was in response to the question about who had shot the highway patrolman?
A. I'm claiming the Fifth Amendment.
Other questions were asked Krecic about her purported statement, to all of which she claimed her privilege against self-incrimination. Hansen objected to the substance and mode of this sequence.
Our context is important. Substantial evidence shows Krecic was on the scene on the evening of April 10, 1987. Common sense suggests she knows who shot Trooper Ladner. Hansen reminds us today that at trial his "defense ... was that the assailant was Krecic or another female, but not himself." (Brief of Appellant, filed June 4, 1990, p. 16). As this was so, the prosecution had a right of retort, Rules 401, 402, Miss.R.Ev., a right to try to discredit Hansen's pointing his finger at Krecic. When Krecic was tendered for cross-examination, the prosecuting attorney was entitled to ask her if Hansen fired the fatal shot and to do so through leading questions. See Rule 611(b), Miss.R.Ev. In point of fact, it appears that prior to trial Krecic had made statements incriminating Hansen. She had told the law enforcement officers that, while she did not shoot Ladner, *133 they "know who did it." She had also said that Hansen "shouldn't've done that." Hansen tells this Court that the said-to-be offending questions put by the prosecution were "a direct quotation from Krecic's statement to the police." (Brief of Appellant, p. 15). This is hardly a case where prosecuting counsel may be charged with birthing a bogus skunk and dragging it through the courtroom to the defendant's detriment. Cf. Lanier v. State, 533 So.2d 473, 487 (Miss. 1988).
Notwithstanding, the prosecution ignored garden variety evidence law in its handling of the matter. Krecic was not on trial, and the prosecuting attorney's sole prerogative ab initio was to ask her, was she there? did she see what happened? and, ultimately, who shot Trooper Ladner? This is but a function of the law's preference for live, in-court, personal knowledge testimony. If Krecic had testified consistent with her prior statements, assuming she had made such statements, the need therefor would have disappeared. See Clanton v. State, 539 So.2d 1024, 1028 (Miss. 1989); Moffett v. State, 456 So.2d 714, 719 (Miss. 1984) (citing cases). If she had given testimony differing from her prior inconsistent statements, in material particulars, then the prosecution would have had the prerogative of impeaching her by confronting her with her prior inconsistent statements. Rule 613(b), Miss.R.Ev.; Harrison v. State, 534 So.2d 175, 179 (Miss. 1988), but, even then, not by tendering them as substantive evidence. See, e.g., Cooper v. State Farm Fire & Casualty Co., 568 So.2d 687, 691 (Miss. 1990); Brown v. State, 556 So.2d 338, 340-41 (Miss. 1990); Lanier v. State, 533 So.2d at 488, 494; but see, Rule 801(d)(1)(A), Miss.R.Ev., and Official Comment thereto, and Staton, Ellis and Williams Mississippi Evidence 202-204 (2d Ed. 1988).
A witness' testimony that she does not remember giving a prior statement may be impeached by questioning about the statement. Harrison v. State, 534 So.2d at 180; Jordan v. State, 513 So.2d 574, 581 (Miss. 1987). The problem is that Krecic neither admitted nor denied anything but "took the Fifth" on all pertinent points, as she was of right entitled. See In re Knapp, 536 So.2d 1330, 1334-35 (Miss. 1988). In Williamson v. State, 512 So.2d 868 (Miss. 1987), in a legally analogous posture, we held taking the Fifth "did not constitute a denial by silence" and that such a response was "not the proper subject for impeachment." Williamson, 512 So.2d at 874. We reaffirm that view today.
All of this is prelude to Hansen's Confrontation Clause argument. The general rule is that the prosecution may not use against the defendant the statement of a non-testifying co-defendant or accomplice. The rule's empirical premise is that such statements are of dubious credibility save they be cured in the crucible of cross-examination. See Lee v. Illinois, 476 U.S. 530, 541-42, 106 S.Ct. 2056, 2062-63, 90 L.Ed.2d 514, 526-27 (1986). Its legal undergirdings are the Confrontation Clause of the Sixth Amendment, see, Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and progeny, and the comparable clause of this state's constitution. Miss.Const.Art. 3, § 26 (1890); Williamson v. State, 512 So.2d at 873; Black v. State, 506 So.2d 264 (Miss. 1987); Mitchell v. State, 495 So.2d 5, 8 (Miss. 1986). Anita Krecic was present in the courtroom, but she is a "non-testifying co-defendant" nonetheless. Cf. Rule 804(a)(1), Miss. R.Ev.; Ponthieux v. State, 532 So.2d 1239, 1246, 1248 (Miss. 1988). There is no hint Hansen procured Krecic's "taking the Fifth." When he called Krecic at trial, Hansen's counsel insisted
She may ... admit to the shooting of Officer Ladner... . I would just love to cross-examine her.
He tried, and got from Krecic nothing but a repetitious "I'm claiming the Fifth Amendment."[8] Counsel then tendered Krecic to the prosecuting attorney, who *134 blundered forth to the brink of reversible error.
The fact that a witness for the prosecution "claims the Fifth" does not per se mean the accused's Confrontation rights have been abridged, for the same reason the mere fact of a witness' memory loss does not per se offend the Clause. United States v. Owens, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988); see also, McCormick on Evidence 48-49 (3d Ed. 1984). We confront today more than Krecic merely "claiming the Fifth." Preceding each such claim prosecuting counsel purportedly read from her earlier, pre-trial statement implying Hansen's guilt and thus leading us to Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) as the case of consequence. At Douglas' trial the prosecution called his accomplice, Loyd, and produced a confession purportedly signed by Loyd. The prosecuting attorney then began to read from the confession, pausing after every sentence or two to ask Loyd if he had "said that," only to have Loyd claim his privilege against self-incrimination. As with Krecic here, Loyd neither admitted nor denied anything, claiming only "the Fifth Amendment." The confession was never offered as evidence. The Supreme Court reasoned
Although the ... [prosecuting attorney's] reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the ... [prosecuting attorney's] reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was tue.
Douglas, 380 U.S. at 419, 85 S.Ct. at 1077, 13 L.Ed.2d at 937-38. Since Loyd claimed the privilege to defense questions as well, and since the prosecuting attorney "was not a witness ... [who could] be tested by cross-examination," the Court found an offense to Douglas' Confrontation Clause rights and reversed.[9]See also, Lee v. Illinois, 476 U.S. at 541-42, 106 S.Ct. at 2062-63, 90 L.Ed.2d at 526-27, where Douglas' core holding is seemingly taken for granted.
In Douglas' light we confront our Williamson opinion. The prosecution called Owen Lee Harden as a witness against Williamson. At the time, Harden was under indictment for conspiracy to commit arson, a charge so intertwined with the murder for which Williamson was on trial, that any testimony he might have given would almost certainly have been used against him later. The prosecution called Harden and put to him a series of questions about a confession he was said to have given "wherein he detailed the events of the murder and implicated Mrs. Williamson as a party to the murder." Williamson, 512 So.2d at 872-873. Harden offered no testimony, invoking his Fifth Amendment privilege. The trial court then allowed the prosecution to impeach Harden by calling the sheriff and another who recited the confession, implicating Williamson.
We said, "had the State only called Harden then Williamson would have no legitimate argument for reversal." Williamson, 512 So.2d at 872-73 (emphasis added). (Douglas, which holds precisely the opposite on legally identical facts, is not mentioned.) We, nevertheless, proceeded to reverse, noting that Williamson had been denied her right of confrontation. We said this, not because of Harden refusing to answer questions or the way the prosecution put the questions to him, but because, although Williamson was
permitted to cross-examine both [the other two witnesses] concerning the circumstances under which the confession was given, this can hardly be said to constitute a substitute for a meaningful cross-examination of the declarant himself. In short, the admission of this testimony *135 [the testimony given by the two witnesses] denied Williamson her constitutional right to confront and cross-examine the witnesses presented against her.
Williamson, 512 So.2d at 873. Of course, the witness Williamson could not confront and cross-examine was Harden, not the sheriff and Harden's other confessee. Our opinion is correctly characterized as reversing because the prosecution was allowed to use against Williamson Harden's statement substantially incriminating Williamson, who because Harden "took the Fifth" could not confront and cross-examine him. This is legally analogous to Douglas' holding of confrontational error in the prosecution's use of Loyd's statement against Douglas. See also, Lee v. Illinois, 476 U.S. at 542-43, 106 S.Ct. at 2063, 90 L.Ed.2d at 527.
On today's appeal, the prosecution dodges Douglas with but two tenuous distinctions: (1) that the defense, not the prosecution, initially called Krecic, and (2) that "by calling Krecic as a witness, the defense opened the door to cross-examination by the prosecution concerning Krecic's knowledge of the crime." Neither "distinction" can withstand a moment's scrutiny.
Hansen put Krecic on the witness stand, but he could not get her to say anything. She had given nothing except her name and address when tendered to the prosecution. She was at that moment easily as fresh a witness as Loyd was in Douglas and more manipulable because subject to the prosecution's leading questions. What the prosecuting attorney then did with Krecic is legally identical to what the prosecution in Douglas did with Loyd. Each is condemned on like authority and reasoning. Hansen's futile questioning of Krecic, albeit before the prosecution took its shot, established Krecic's "unavailability" within Douglas and Confrontation Clause jurisprudence. Cf. Rule 804(a)(1), Miss.R.Ev. That Hansen questioned Krecic first, while in Douglas the prosecution questioned Loyd first, is but a distinction without a difference.
The prosecution's "door opening" thesis fails for the simple reason that such doors are opened only co-extensive with what the opening party offers. Our focus is upon the answers elicited, not the questions asked. As Krecic said nothing, Hansen's calling her opened the door to nothing. All of this proceeds from the elementary truth that one party's calling a witness does not empower the other to ask impermissible questions. See Ponthieux v. State, 532 So.2d at 1245-48; Murphy v. State, 453 So.2d 1290, 1294 (Miss. 1984). We may only hold the Circuit Court erred when it allowed the prosecution to question Krecic regarding her statement.

B.
Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), recognized in the states authority to employ a limited harmless error analysis and to hold offenses to certain of an accused's constitutional rights do not per se require reversal. The Chapman test is whether it appears
beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.
Chapman, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710. This prerogative extended the states exists where, as here, the accused's Confrontation Clause rights have been violated. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674, 686 (1986); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Arizona v. Fulminante, 499 U.S. ___, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), and Yates v. Evatt, 500 U.S. ___, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), have refined the analysis, viz. an error is constitutionally harmless where it may fairly be said
unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.
Yates, 111 S.Ct. at 1893.
Repeatedly fixing our focus upon "the issue in question," Yates inaugurated a two-step process. First, the reviewing court must "ask what evidence the jury actually considered in reaching its verdict." Yates, 500 U.S. at ___, 111 S.Ct. at 1893, 114 L.Ed.2d at 449.

*136 In answering this question, a court does not conduct a subjective enquiry into the jurors' minds.
Yates, 500 U.S. at ___, 111 S.Ct. at 1893, 114 L.Ed.2d at 449. The Court then articulated the objective contours of the quest.
The answer must come ... from analysis of the instructions given to the jurors and from application of that customary presumption that jurors follow instructions and, specifically, that they consider relevant evidence on a point in issue when they are told that they may do so.
Yates, 500 U.S. at ___, 111 S.Ct. at 1893, 114 L.Ed.2d at 449. The question, in the end, is whether
the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the ... [rights violation],
here, in the absence of the prosecutor's offense to the Confrontation Clause. Yates, 500 U.S. at ___, 111 S.Ct. at 1893, 114 L.Ed.2d at 449.
The "issue," of course, is whether Hansen killed Trooper Ladner, whether Hansen was the trigger man. The Circuit Court submitted this simple factual issue under conventional instructions that the jury should find Hansen guilty of capital murder if it find beyond a reasonable doubt that, under statutorily specified conditions, Hansen "did ... kill and murder ... David Bruce Ladner... ." The Court further instructed the jury it could consider various forms of evidence, viz.
The testimony and statements of the witnesses and the exhibits offered and received ... [and] such reasonable inferences as seem justified in the light of your own experience.
The evidence that Hansen killed Trooper Ladner is overwhelming. To begin with, all of the evidence shows two persons, a young man and a young woman, with Ladner along I-10 on the evening of April 10, 1987. Reasoning backwards, we know Hansen was the man because
(a) Daisy Morgan identified Hansen as the man who, a short while later, arrived with a female companion in a Highway Patrol car, and stole Morgan's Ford Ranger;
(b) Pat Ladner identified Hansen as the man who arrived at his house later that evening with a female companion;
(c) Jody Wade and Charlie Williams identified Hansen whom they took, with Krecic, first to the Ladner's and thereafter toward Waveland;
(d) State Troopers Freddie Keel and Darryl Deschamp identified Hansen as the man they took into custody while en route to Waveland with Wade and Williams; and
(e) Critically, Troopers Keel and Deschamp found on Hansen  some six hours after Ladner had been shot  (1) the MHSP standard issue .357 Magnum which had been checked out to Ladner and (2) a.38 caliber handgun  the bullet removed from Ladner's neck had been fired from a .38 caliber gun.
If this be not enough, we return to April 10's early evening hours and find that
(f) Kathy Romany, who had followed the blue town car westward along I-10 all the way from Florida, identified Hansen as the driver;
(g) William Forrest Runnels and Charles E. Childress, both motorists passing by, said they saw a blue town car, a state trooper's car, and a man and a woman and, of importance, that they saw the man stuffing a large pistol into his pants;
(h) Steve Diaz identified Hansen as the man he saw standing over the wounded and bleeding state trooper and as the man who drove away in the trooper's car; and
(i) Paul Tibbetts and Donald Ray Meche each made an in-court identification of Hansen as the man who shot and killed Trooper Ladner.
If the cake need icing, (j) Clydell Morgan testified that he found Hansen's left thumbprint on the consent to search form, Hansen's left little fingerprint on the map, and a right palmprint on another incriminating document. Add to this (k) the absence of the slightest shred of evidence that Krecic *137 pulled the trigger, and we have in the record, acceptable of consideration by reference to the Court's instructions to the jury, evidence that overwhelms.
Yates' further focus demands we weigh the probative force of the impermissible and, having done so, that we balance this against the permissible evidence on "the issue." Translated, we evaluate the persuasive force of the prosecution's impermissible efforts at examining Krecic regarding her prior statement. When we do this we find but a page and a half out of a trial transcript of two thousand pages. The prosecuting attorney asked Krecic but eight questions about her statement. Only the two quoted above suggested Hansen may have been the trigger man and these but obliquely. In candor, nothing in this sequence supported Hansen's effort to throw the blame on "Krecic or another female, but not himself," yet it is a far cry from the prosecution's damning dramatics in Douglas and in Williamson. We regard the probative value of today's impermissible as slight, so slight that, when we weigh it against the permissible evidence before the jury, we are left satisfied beyond a reasonable doubt that, on the issue whether Hansen shot and killed Trooper Ladner, the verdict reasonably may only have been that he did, even had the prosecution not used Krecic's statement to the offense of Hansen's Confrontation Clause(s) rights.
We hold that the present error was harmless beyond a reasonable doubt. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); cf. Rule 103(a), Miss.R.Ev. We regard as nil the chances that, had the prosecution not done what it did in its purported cross-examination of Krecic, the jury would have returned any other verdict on "the issue in question."

XIX. In-Court Eyewitness Identification Testimony

Hansen argues that the Circuit Court erred when it refused to suppress the in-court identification testimony of Daisy Morgan, Beatrice Ladner, Pat Ladner, Kathy Romany, Donald Meche, Steve Diaz. The point implicates the familiar standards of Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), accepted by this Court in York v. State, 413 So.2d 1372 (Miss. 1982) and progeny.
Only pretrial identifications which are suggestive, without necessity for conducting them in such manner, are proscribed. A lineup or series of photographs in which the accused, when compared with the others, is conspicuously singled out in some manner from the others, either from appearance or statements by an officer, is impermissibly suggestive. (citations omitted) A show up in which the accused is brought by an officer to the eyewitness is likewise impermissibly suggestive where there is no necessity for doing so. (citations omitted).
An impermissibly suggestive pretrial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure, unless: (1) from the totality of the circumstances surrounding it (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.
Even if testimony is proffered of the out-of-court identification itself, the same standard exists as to the above, with the omission of the word "irreparable."
York, 413 So.2d at 1383. We have observed these standards numerous times. Wilson v. State, 574 So.2d 1324, 1327 (Miss. 1990); Magee v. State, 542 So.2d 228, 232-33 (Miss. 1989); White v. State, 532 So.2d 1207, 1213-14 (Miss. 1988); Nicholson v. State, 523 So.2d 68, 71-72 (Miss. 1988); Davis v. State, 510 So.2d 794, 796 (Miss. 1987); see also, Mackbee v. State, 575 So.2d 16, 37 (Miss. 1990).
In today's case we have considered the point with care, for it is not clear any of these witnesses had much opportunity to see and observe Hansen on the evening of April 10. We accept that the decision is for the Circuit Court in the first instance. That Court must consider, when evaluating the likelihood of misidentification:

*138 (1) The opportunity of the witness to view the criminal at the time of the crime;
(2) The witness's degree of attention;
(3) The accuracy of the witness's prior description of the criminal;
(4) The level of certainty demonstrated by the witnesses at the confrontation; and
(5) The length of time between the crime and the confrontation.
Biggers, 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411; Wilson, 574 So.2d at 1328; Magee, 542 So.2d at 232. In the case of each of the witnesses at issue, the Circuit Court carefully considered the evidence and made a finding of fact to the effect that, the witness having been on the scene on the evening of April 10, 1987, his or her present in-court identification of Hansen had not been impermissibly tainted by prior exposure to line-up photographs and the like.
Our scope of review in such matters is familiar.
The combined effect of the circuit court's pretrial and trial rulings is that of a finding of fact that, under the totality of the circumstance ... in-court identification testimony had not been impermissibly obtained. We may, or course, disturb such a finding only where there is an absence of substantial credible evidence supporting it.
Magee v. State, 542 So.2d 228, 231 (Miss. 1989) (quoting Nicholson v. State, 523 So.2d 68, 71 (Miss. 1988) [quoting Ray v. State, 503 So.2d 222, 224 (Miss. 1986)]). This Court's task is determining whether, in the case before it, there was "substantial credible evidence supporting the trial judge's findings." Nicholson, 523 So.2d at 71. Considered in this context, we may not fairly say the Circuit Court acted impermissibly in the case of any of these six witnesses.

XX. Discovery Violation

Hansen next argues that the Circuit Court erred when it denied his motion for a mistrial after prosecution witness, Paul Tibbetts, identified Hansen in open court as the man who shot Trooper Ladner. Hansen's point is that the prosecution failed in its pre-trial discovery obligations and that Tibbetts' identification testimony fatally compromised the defense at trial.
There is no question but that Hansen has made an all encompassing request for discovery, in consequence of which the prosecution had a duty to disclose the names and addresses of all of its witnesses. The prosecution delivered Tibbetts' name to Hansen's counsel some six months prior to trial, and, as well, a copy of Tibbetts' fourteen-page signed witness statement. The problem is that in this statement Tibbetts had said that he did not believe he could identify the man he saw shoot Trooper Ladner. In pretrial hearing, the Court reminded the parties of their continuing duty to make discovery.
It appears the prosecution learned during the noon recess of day two of the trial, October 17, 1987, that Tibbetts could identify Hansen as the man who shot Trooper Ladner. The prosecution disclosed this to no one, and about an hour and a half later called Tibbetts, who graphically described the murder, then pointed to Hansen in the courtroom and firmly told the jury Hansen "was the shooter." When asked about his prior statement, Tibbetts said he had not realized he could identify the man he had seen until he came to court that day. He then said he had been seeing this man's face in his dreams and, when he saw him earlier the day he testified, he had realized he could "possibly" identify him.
Out of the jury's presence, defense counsel moved for a mistrial, citing Rule 4.06, Miss.Crim.R.Cir.Ct.Prac. (1979, as amended), and arguing they had not been notified during the day that Tibbetts thought he could make an identification. Defense counsel acknowledged they had Tibbetts' statement.
After questioning Tibbetts, the Court denied the mistrial but took a recess and allowed the defense to question Tibbetts. This took about forty minutes. The Court offered to keep Tibbetts off the stand until the defense had more time to interview him and plan what to do. Counsel for defense *139 declined, saying he had to cross-examine him quickly.
Rule 4.06, as it read at the time of Hansen's 1987 trial, provided that:
(a) The prosecution shall disclose to each defendant or to his attorney, and permit him to inspect, copy, test, and photograph upon request and without further order the following:
(1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial;
There is no question but that, initially, the prosecution did its duty and more. Six months before trial, it disclosed Tibbetts' name, address and statement. The question is whether the prosecution met its continuing duty.
(e) If, subsequent to compliance with these rules or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, he shall promptly notify the other party or his counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified.
The continuing nature of discovery duties was well known prior to Hansen's trial. Stewart v. State, 512 So.2d 889, 891-92 (Miss. 1987) (citing Foster v. State, 484 So.2d 1009, 1011 (Miss. 1986)); Acevedo v. State, 467 So.2d 220, 224 (Miss. 1985); Gallion v. State, 396 So.2d 621, 622 (Miss. 1981). The scope of the continuing duty is measured by the original duty. The prosecution had only that duty to supplement discovery regarding Paul Tibbetts as it had to make discovery regarding him originally.
Here it is important that, as it read in 1987, Rule 4.06(a)(1) required, with respect to prosecution witnesses, disclosure only of "names and addresses." The duty to disclose witness statements was not added until January 31, 1990. The prosecution's duty was a function of the rule as it then read, and nothing in the rule as it then read obligated the prosecution to disclose Tibbetts' witness statement nor to supplement it with later received information. The fact that the prosecution disclosed Tibbetts statement did not enlarge this duty, absent evidence of bad faith or chicanery.
Nothing in West v. State, 553 So.2d 8 (Miss. 1989), is to the contrary. It is true in West a prosecution witness, previously disclosed in discovery, developed new testimony the day of trial and we reversed. The witness in West was an expert. Rule 4.06(a)(3) as it then read required disclosure of the "reports or statements of experts" and Rule 4.06(e) required supplementation of that discovery. We reversed because the prosecution was allowed to present to the jury a previously undisclosed expert theory explaining the defendant's conduct at the time of the murder.
We affirm on this issue because no rule of law required the prosecution, when it learned of Tibbetts' likely testimony during the noon recess, to disclose the substance thereof before calling him as a witness that afternoon. Because this information in 1987 was not within the scope of Rule 4.06(a) nor Rule 4.06(e), we never reach the familiar procedures emanating from Box v. State, 437 So.2d 19 (Miss. 1983) (Robertson, J., specially concurring). We emphasize that, with our 1990 amendments to Rule 4.06, the outcome of this issue may not be the same had this trial taken place today.

XXI. Opening Statements and Closing Arguments

Hansen argues that the prosecuting attorneys engaged in improper opening statements and closing arguments. Hansen complains of two areas: (1) the prosecution brought out the fact Trooper Ladner had been married and had three children; (2) in closing argument at the guilt phase, the prosecuting attorney commented that the evidence it offered had overcome the presumption of innocence.
We find in the record no defense objection to either of these arguments. Given the wide latitude generally available to counsel in closing argument, see Shell v. State, 554 So.2d 887, 899-900 (Miss. 1989), vacated on other grounds, ___ U.S. ___, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); Johnson v. State, 416 So.2d 383, 392 (Miss. 1982); Gray v. State, 351 So.2d 1342, 1346-47 *140 (Miss. 1977); all quoting Nelms & Blum Co. v. Fink, 159 Miss. 372, 382-83, 131 So. 817, 820-21 (1930), we hold Hansen's failure to object leaves the points waived and requiring no further consideration. See, e.g., Minnick v. State, 551 So.2d 77, 93 (Miss. 1988), reversed on other grounds, 498 U.S. ___, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); Cole v. State, 525 So.2d 365, 369 (Miss. 1987); Johnson v. State, 477 So.2d 196, 209-10 (Miss. 1985).

XXII. Jury Nullification

Hansen argues that the Circuit Court instructed the jury so as to eviscerate the principle of jury nullification and in this way denied rights secured to him under the Sixth and Fourteenth Amendments to the Constitution of the United States. He complains particularly of two instructions which, as we read them, merely instruct the jury correctly regarding this state's law of capital murder and regarding the jury's duty to follow the law and not "be concerned with the wisdom of any rule of law."[10]
The principle of jury nullification is a familiar one, and there can be no doubt of the jury's power to ignore the law and, via the Double Jeopardy Clause, protect and insulate an accused from further prosecution. We have held repeatedly, however, that no such instruction should be given the jury. Rose v. State, 556 So.2d 728, 733 (Miss. 1990); Davis v. State, 520 So.2d 493, 494 (Miss. 1988); Hentz v. State, 489 So.2d 1386 (Miss. 1986); Leatherwood v. State, 435 So.2d 645 (Miss. 1983). A fortiori, an instruction that implicitly condemns jury nullification is not error. We find the issue without merit.

XXIII. Denial of Hansen's Proposed Jury Instructions

Hansen argues that the Circuit Court erred in its "wholesale denial" of his proposed jury instructions. He offers little in the way of particulars. We address the points Hansen addresses.

A.
At the guilt phase, Hansen asked that the jury be instructed regarding credibility of the law enforcement officers who appeared as witnesses, viz. that they are to be seen no more believable than any other witness.[11] The Court refused the instruction.[12]
*141 Our law of criminal procedure has long perceived dangers in comments upon the evidence, and in that regard we have for years had a statute, Miss. Code Ann. § 99-17-35 (1972), which reads in pertinent part:
The judge in any criminal cause, shall not sum up or comment on the testimony, or charge the jury as to the weight of evidence... .
We have on at least two occasions invoked this statute to affirm Circuit Court refusals to give instructions legally identical to that Hansen proposed. Washington v. State, 341 So.2d 663, 664 (Miss. 1977), and Stewart v. State, 355 So.2d 94, 97 (Miss. 1978). It is certainly true that of late our attitude toward comments upon the evidence may have relaxed, see Nichols v. Munn, 565 So.2d 1132, 1136-37 (Miss. 1990); Weaver v. State, 497 So.2d 1089, 1094 (Miss. 1986), but not so much that we will require the instruction at issue. We affirm on this issue.

B.
More generally, Hansen argues that the case against him was based upon mistaken eyewitness identification testimony, and he sought to have the jury instructed on the point.[13]
The proposed instruction, GP-13, was a cautionary instruction concerning eyewitness identification testimony. In Holmes v. State, 483 So.2d 684, 687 (Miss. 1986), this Court held such instructions were properly refused.[14] The Court said:
[W]e know of no rule of law or standard of evidence which requires that identification testimony be viewed with caution and that juries be instructed to that effect. Our cases on the point expressly hold that such an instruction should not be given. Hines v. State, 339 So.2d 56, 58 (Miss. 1976); Clubb v. State, 350 So.2d 693, 697 (Miss. 1977); Ragan v. State, 318 So.2d 879, 882 (Miss. 1975) (emphasis in original).
Again, the jury was instructed generally on its duty to scrutinize carefully all testimony of all witnesses, and, as well, on the prosecution's burden to prove Hansen guilty beyond a reasonable doubt. We find no error here.

XXIV. Lesser Included Offense Instruction

Hansen argues that the Circuit Court erred when it refused to submit a lesser included offense instruction to the jury. We have searched the record and find no such instruction which Hansen requested. On appeal, he presses the point without ever telling us just what lesser-included offense he has in mind. Hansen cites and relies upon a number of familiar cases addressing the point. See e.g., Mease v. State, 539 So.2d 1324 (Miss. 1989); Fairchild v. State, 459 So.2d 793, 801 (Miss. 1984); Ruffin v. State, 444 So.2d 839, 840 (Miss. 1984); Lanier v. State, 450 So.2d 69 (Miss. 1984), and, of course, Jackson v. State, 337 So.2d 1242, 1254-55 (Miss. 1976); Beck v. Alabama, 447 U.S. 625, 642, 100 S.Ct. 2382, 2392, 65 L.Ed.2d 392, 405 (1980); see, most recently, Schad v. Arizona, 501 *142 U.S. ___, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).
Given the circumstances, we may assume he is thinking of non-capital murder or manslaughter. We may not go that far for the fact that Hansen requested no lesser included instruction controls. Considering the point, notwithstanding Hansen's procedural default, we perceive no lesser offense instruction to which on the evidence he may have been entitled. We find no merit to this issue.

XXV. Cumulative Effect of Trial Errors

Hansen finally argues that, even though no error in and of itself requires reversal, the Court should consider all errors at trial for their accumulative effect. He cites our familiar rule which goes back at least to Russell v. State, 185 Miss. 464, 469, 189 So. 90, 91 (1939), which held:
It is true that not one of these errors, when considered separately and apart from the others, is sufficient to justify a reversal of the case, but when they are considered as a whole it is out view that they resulted in the appellant being denied a fair trial... .
This rule has been recognized in numerous later cases, e.g., Griffin v. State, 557 So.2d 542, 553 (Miss. 1990); Shell v. State, 554 So.2d at 906; Stringer v. State, 500 So.2d 928, 939 (Miss. 1986); Williams v. State, 445 So.2d 798, 810 (Miss. 1984).
In the case at bar, we have noted three trial errors. See Parts III, XI and XVIII, above. Only one involves a point of evidence. Neither of the others suggests at the guilt phase Hansen has been denied his substantial right to a fair trial. We hold the errors in this case, given their cumulative effect, harmless beyond a reasonable doubt.

PENALTY PHASE

XXVI. Heightened Scrutiny

As we proceed to our review of the phase of the proceedings below which led to Hansen's sentence of death, we renew our commitment to that bundle of principles alternatively labeled "heightened scrutiny" and "death is different." These review principles have been accepted in this Court as early as Irving v. State, 361 So.2d 1360, 1363 (Miss. 1978), and even before in cases such as Russell v. State, 185 Miss. 464, 469, 189 So. 90, 91 (1939). More recently we have noted them in cases such as Williamson v. State, 512 So.2d 868, 872 (Miss. 1987), Griffin v. State, 557 So.2d 542, 552-53 (Miss. 1990), Berry v. State, 575 So.2d 1, 14 (Miss. 1990), and Holland v. State, 587 So.2d 848, 853 (Miss. 1991). When we say these things, we do no more than that which the Supreme Court has mandated in cases from Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976), down through and including Lankford v. Idaho, 500 U.S. ___, ___, 111 S.Ct. 1723, 1732, 114 L.Ed.2d 173, 187 (1991).
These principles have long manifested themselves in varying particulars. We consider trial errors for the cumulative impact. See, e.g., Russell v. State, 185 Miss. at 469, 189 So. at 91. We apply our plain error rule with less stringency. See, e.g., Augustine v. State, 201 Miss. 731, 740, 29 So.2d 454 (1947). We relax enforcement of our contemporaneous objection rule. See, e.g., Culberson v. State, 379 So.2d 499, 506 (Miss. 1979). We resolve serious doubts in favor of the accused. See, e.g., Gambrell v. State, 92 Miss. 728, 736, 46 So. 138, 139 (1908). As indicated, we afforded heightened scrutiny on appeal. Translated, what becomes harmless error in a case with less at stake may become reversible error when the penalty is death, Irving v. State, 361 So.2d at 1363, as procedural niceties give way to the search for substantial justice, all because death undeniably is different.
What is important for today is that we understand none of this means the rules themselves change as the penalty of death is sought. Neither the contemporaneous objection rule nor any other rule of procedure or substance becomes metamorphosed into something more favorable to the capital defendant. Any contrary thought may be safely branded error.

*143 XXVII. Abuse of Prosecutorial Discretion

Prior to trial, Hansen moved the Court for an order precluding the jury's consideration of the death penalty on grounds the office of the District Attorney, Second Circuit Court District, had a long history of arbitrary and improper exercise of prosecutorial discretion in plea bargaining in potential capital cases. Hansen called, adversely, former Assistant District Attorney Gray Burdick who explained the prosecution's handling of recent capital cases and the plea bargains which were made. He told, for example, of two capital murder cases where the prosecution acquiesced in the request of the victims' families and negotiated a plea bargain for a life sentence. He told of another where the prosecution's principal witness died and he, Burdick, felt it prudent to accept a guilty plea to the lesser offense of manslaughter. In two other cases, capital murder defendants received life sentences when penalty phase juries were unable to agree on sentence, and in another, the jury unanimously decided upon a life sentence. In yet another, the prosecution failed to secure a conviction on the underlying capital murder charge.
The Circuit Court took judicial notice of a number of capital murder trials, over which the sitting judge had presided, and then held that Hansen had failed to show an arbitrary or capricious use of prosecutorial discretion and denied the motion.
We considered a similar issue in Ladner v. State, 584 So.2d 743, 750 (Miss. 1991), arising from the same circuit court district, and held the claim without merit. Without repeating what we said in Ladner, we would emphasize that "[p]rosecutorial discretion is absolutely necessary and an essential element of our system of criminal jurisprudence." Culberson v. State, 379 So.2d 499, 511 (Miss. 1979) (Walker, specially concurring). Our prosecuting attorneys have wide latitude in exercising this discretion, and "[p]lea bargaining is an essential part of the criminal justice system." Edwards v. State, 413 So.2d 1007, 1012 (Miss. 1982) (quoting Boyington v. State, 389 So.2d 485, 490 (Miss. 1980)); Salter v. State, 387 So.2d 81, 83-84 (Miss. 1980); Pearson v. State, 428 So.2d 1361, 1364-65 (Miss. 1983); Blackledge v. Allison, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977); Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). This does not mean that there are no limits, only that those we have tolerate not inconsiderable discretion.
In light of the Circuit Court's finding that the evidence and testimony had not shown arbitrariness in plea bargaining within the district, and the wide discretion the law allows prosecutors in making plea bargains, we hold this issue without merit.

XXVIII. Uniformed Officers at Trial

Before trial, Hansen moved the Court to restrict the wearing of uniforms by highway patrolmen when sitting as spectators in the courtroom. The Court stated that, if it appeared the prosecution was loading the courtroom with an undue number of uniformed officers and prejudicially so, Hansen should call the matter to the Court's attention at that time and that he would be "in a great position to get a mistrial... ." The Court overruled the then-pending motion.
During the penalty phase, the defense renewed the point, saying,
We believe that the courtroom is now of such a condition with Highway Patrol officers with their weapons that it is in violation of Fuselier, and we would ask that they be removed from the courtroom, and on the failure to remove them from the courtroom or properly admonish them, we would then ask for a mistrial as to this portion of the trial.
The Court noted there were about thirty-nine or forty people in the courtroom who could be considered spectators, exclusive of court officers and personnel. There were two officers from Harrison County who had custody of the defendant, four officers acting as bailiffs, and six highway patrolmen in the spectator part. Those six were mingling with the lay personnel, and "I don't see anyone of them with a gun on, or either they're sitting someplace where I can't see the gun." The Court found the *144 uniformed officers were not intimidating the jury to Hansen's prejudice.
Hansen also complains of remarks made by the prosecuting attorney in closing argument that emphasized and prejudiced the jury regarding the uniformed officers. The statement was as follows:
I think over the last few days as you have seen this  this testimony, you understand the concerns that we had that, you know, certainly we don't want old Kirk Ladner over there on this jury because all that's kept him in that chair is faith in you. All that's kept these policemen with their weapons holstered is faith in you.
Hansen made no objection to these comments.
We perceive no basis for holding the Circuit Court abused its discretion in handling these matters.

XXIX. Life Means Life

Hansen complains that the Circuit Court denied him the opportunity to question the prospective jurors on the difference between a sentence of life imprisonment and a sentence as an habitual offender to life without parole. He points to the fact that during voir dire, juror McClean, concerned of the effect of a life sentence, asked: "If a murderer is back on the street in five years, then what choice do we have?" The Court replied: "If you take your seat on this jury, you should assume that a sentence of death will, in fact, be carried out ..."
At the end of the guilt phase, and following the jury's return of a verdict that Hansen was guilty of capital murder, the Circuit Court in a moment of commendable prescience convened a hearing on the question whether Hansen should be sentenced as an habitual offender,[15] Miss. Code Ann. § 99-19-81 (Supp. 1989). See Rules 5.13(2) and 6.04(3), Miss.Unif.Crim.R.Cir.Ct.Prac. (1979, as amended). The Court found that Hansen had suffered two prior convictions within Section 99-19-81 and adjudged him an habitual offender. Then at the penalty phase the Circuit Court instructed the jury that a life imprisonment sentence would mean life "without probation or parole."[16]
The habitual offender process removes any significant element of speculation regarding the meaning of a sentence of life imprisonment, and because of this we have recently held that the Circuit Court should proceed exactly as was done in this case. See Mackbee v. State, 575 So.2d 16, 38-41 (Miss. 1990); Berry v. State, 575 So.2d 1, 13-14 (Miss. 1990); Turner v. State, 573 So.2d 657, 674-75 (Miss. 1990), followed most recently in Ladner v. State, 584 So.2d 743, 758 (Miss. 1991).
Because Hansen's habitual offender status had been established, the fact that a life sentence would mean life without parole had been established to a legal certainty. The Circuit Court correctly informed the jury of this fact. We find that the Circuit Court's process complied fully with the Turner-Berry-Mackbee mandate and that Instruction No. C2S more than cured any error in limiting the defense on voir dire.

XXX. Evidence of Other Prior Convictions

Hansen complains that the Circuit Court admitted, over his objection, evidence of his ten prior felony convictions in Florida. We have addressed Hansen's objection at the guilt phase. At the penalty phase, Hansen argues that only two prior convictions were required to establish his habitual offender status and that "nothing was to be gained parading the other ten convictions before the jury." He argues that the prejudicial impact of the other *145 convictions outweighed their probative value rendering them inadmissible. See Rules 609 and 403, Miss.R.Ev. We do not think so, and for two reasons.
First, notions of necessity form no part of the rule of relevance in our law of evidence. Rules 401-403, Miss.R.Ev. Evidence is relevant if it would suggest to the jury that a fact of consequence is more likely so or not so than it would appear without the evidence. See Kolb v. State, 542 So.2d 265, 269 (Miss. 1989); Edlin v. State, 533 So.2d 403, 410 (Miss. 1988); Jenkins v. State, 507 So.2d 89, 91-92 (Miss. 1987). We are concerned whether the evidence is too speculative, as in the case of hearsay, or whether its use would compromise other interests, as with privileged communications, but we largely leave necessity judgments to the litigants, subject only to the trial court's discretionary competence under Rule 403 to say enough is enough and put a stop to the parade on grounds of repetition, redundancy and cumulativeness. We almost never reverse on these latter grounds.
The more serious question is whether this evidence transgresses legal limits on what the prosecution may show in aggravation. Miss. Code Ann. § 99-19-101(5) provides that aggravating circumstances shall be limited to the following:
(b) The defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person.
Hansen's pre-1987 criminal record consists of four grand theft convictions, four burglary convictions and two escape convictions. None of these is "a felony involving the use or threat of violence to the person" within Section 99-19-101(5)(b). This would suggest they are of doubtful relevance. Rule 401, Miss.R.Ev.; Jenkins v. State, 507 So.2d at 91-92.
Notwithstanding the seemingly absolute "shall be limited" language of the statute, we have in the past upheld the prosecution's proof of a non-statutory aggravating circumstance of future dangerousness. Ten prior convictions over the space of ten years are substantial evidence that Hansen lacked the ability to conform his behavior to the norms society demands. We cannot rationally say that this evidence was irrelevant to the question of the punishment Hansen should receive for his most recent crime. See Nixon v. State, 533 So.2d 1078, 1098-99 (Miss. 1987); Woodward v. State, 533 So.2d 418, 433-34 (Miss. 1988); and Leatherwood v. State, 435 So.2d 645, 652 (Miss. 1983).
Here, however, the evidence was not offered in aggravation, and the jury was not instructed that these prior convictions could be considered as aggravating circumstances. The jury's verdict at sentencing did not rely upon these. Rather, the prosecution's use of these prior convictions appears in the nature of rebuttal evidence. At the penalty phase Hansen produced a number of witnesses who testified regarding his past. The Circuit Court allowed Hansen great leeway in proving by way of mitigation the assorted troubles and difficulties of his youth, and, as well, positive points regarding his behavior while incarcerated. These ten prior convictions are as much a part of Hansen's life story as the proof he offered himself. In this context, we find no error in the Circuit Courts admitting this evidence.

XXXI. Graphic Photographs

Hansen argues that the Circuit Court erred when it allowed the prosecution, at the penalty phase, to present a photograph of a substantial part of the body of Trooper Ladner. Hansen had objected at trial on relevancy grounds charging that it was inflammatory and gruesome. Hansen cites our increasingly familiar decision in McNeal v. State, 551 So.2d 151, 158-59 (Miss. 1989) wherein we held the circuit court had abused its discretion when it allowed into evidence photographs depicting the victim's "decomposed, maggot-infested" skull.
Today's case is at the opposite extreme. First, the photograph was carefully cropped so as to reflect only the back and not the rest of Trooper Ladner's body. *146 There is nothing gruesome about it. Prosecution witnesses testified that the photograph fairly and accurately depicted the location of the entrance wound on the lower back. We have held admissible photographs reflecting the location of entrance wounds in prior homicide prosecutions. See, e.g., Turner v. State, 573 So.2d 657, 667 (Miss. 1990); Kelly v. State, 463 So.2d 1070, 1074-1075 (Miss. 1985); Holliday v. State, 455 So.2d 750, 752 (Miss. 1984). The photograph appears to have been made contemporaneous with the autopsy and does not show the shoulder wound at all.
Moreover, the photograph was not offered at the guilt phase but only at the penalty phase. Presumably it is offered as evidence the homicide was "especially heinous, atrocious or cruel." At the penalty phase it will ordinarily be relevant to show how the victim died. Mackbee v. State, 575 So.2d 16, 31-32 (Miss. 1990). See Miss. Code Ann. § 99-19-101(5)(h) (Supp. 1989). We find no error in the admission of this photograph.

XXXII. Victim Characteristics Evidence

Hansen charges further that the Circuit Court erred when it imposed the death penalty in substantial part on the basis of characteristics of the victim. He refers to the fact that David Bruce Ladner was an officer  a State Trooper, if you will  of the Mississippi Highway Safety Patrol. He argues that consideration of this factor violates rights secured to him by the Eighth and Fourteenth Amendments of the Constitution of the United States because it arbitrarily subjects him to the death penalty by reason of characteristics of his victim. Hansen rests his point on the core notion that all the prosecution need show of a homicide victim is that, prior to the fatal act, he was a living human being and that the offense is no less murder if the victim was the town drunk rather than its most upstanding citizen. See Dickerson v. State, 441 So.2d 536, 538 (Miss. 1983); cf. Goodson v. State, 566 So.2d 1142, 1148 (Miss. 1990).
The relevance of this evidence is a function of the statute under which Hansen has been indicted and tried. Miss. Code Ann. § 97-3-19(2) (Supp. 1990) provides in pertinent part:
(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
(a) Murder which is perpetrated by killing a peace officer or fireman while such officer or fireman is acting in his official capacity or by reason of an act performed in his official capacity, and with knowledge that the victim was a peace officer or fireman. For purposes of this paragraph, the term "peace officer" means ... personnel of the Mississippi Highway Patrol... .
This statute reflects the state's special interest in protecting law enforcement officers. To bring a case within the statute, the evidence must reflect that the victim was a peace officer acting in the course of his official duties and that, at the time of the killing, the defendant knew or should have known of this fact. If this be so-called victim impact evidence, so be it.
Of course, our statutory capital sentencing scheme is subject to constitutional scrutiny. During the late but brief reign of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), this Court did its duty and scrupulously scrutinized capital sentencing processes to the end that victim impact evidence and argument not be impermissibly permitted. We are now told there is no bar in federal law to our allowing prosecutors to produce for the jury
at the sentencing phase evidence of the specific harm caused by the defendant... . A state may legitimately conclude that evidence about the victim and about the impact of the murder or the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.
Payne v. Tennessee, 501 U.S. ___, ___, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736 (1991). Payne, of course, is properly phrased in terms of the constitutionally permissible, not the mandatory, and in prudence, we should await another day to explore the full reach of our rediscovered *147 freedom. Suffice it to say that evidence of David Bruce Ladner's status and service as an MHSP officer was probably permissible before Payne and is certainly now well within what the law allows. This issue appears to be meritless.

XXXIII. Opinion Testimony on Hansen's Adaptability to Prison
 
Life As a Mitigating Circumstance
Hansen argues further that the Circuit Court erred when it refused to allow evidence that he would adapt well to prison life in the future. He points particularly to Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), wherein the Court wrote:
[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating.
Skipper, 476 U.S. at 5, 106 S.Ct. at 1671, 90 L.Ed.2d at 7. All of this is but an elaboration upon the familiar lesson of Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973, 989-900 (1978): "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." The Constitution demands individualized sentencing and prohibits a court from excluding any relevant mitigating evidence as a matter of law. Eddings v. Oklahoma, 455 U.S. 104, 113-14, 102 S.Ct. 869, 876-77, 71 L.Ed.2d 1, 10-11 (1982).
We have long accepted the rule, but it does not produce the result Hansen seeks. At issue is a small portion of the proffered testimony of Fred Weist, a prison counselor from Florida who knew Hansen while the latter was incarcerated within that state's correctional system. The Court allowed Weist substantial liberties in testifying about Hansen's past. The Court sustained the prosecution's objections to Weist's opinion how Hansen would adapt to prison life in the future and as to whether Hansen "was treatable in any prison setting." The Court held this testimony speculative and without foundation. Our review of the record fails to reflect Weist qualified or accepted as an expert in predicting future behavior. See Rule 702, Miss.R.Ev. We find no error in the Circuit Court's action regarding Weist's testimony.
The Court also excluded from evidence a letter of reference Eddie Holt had written to the Court, prior to learning he was going to testify, saying it was cumulative of his actual testimony. Rule 403, Miss.R.Ev. Holt was allowed to testify about his visit with Hansen and the Bible studies Hansen had undertaken and completed, as well as other aspects of his relationship with and observations of Hansen. We find no error in excluding the letter.

XXXIV. Cross-Examination Via Hansen's Florida Disciplinary
 
Reports
Hansen charges the Circuit Court erred when it allowed the prosecuting attorney to use disciplinary reports from Hansen's Florida incarcerations in cross-examining Hansen's mitigation witnesses at the sentencing phase. What happened is this: at the sentencing phase, Hansen called three witnesses  Carol Kane, a prior romantic interest who visited Hansen often in prison; Joy Reichgott, an insurance clerk who became pen pals with Hansen while he was in Avon Correctional Facility; and prison counselor Fred Weist, mentioned in Part XXXII above. Through each of these individuals, Hansen's lawyer, on direct examination, elicited testimony that Hansen had adapted well to prison life and the like, all of which was couched to convince the jury that Hansen's future behavior as a prisoner, if his life be spared, would be such that he would pose no threat or danger to anyone.
On cross-examination the prosecution sought to discredit this testimony. In the case of the three witnesses  Kane, Reichgott and Weist  the prosecuting attorney asked each if he or she were aware of Hansen's disciplinary record while incarcerated in Florida. We find in the record a series of disciplinary reports over the period *148 April 4, 1982, through March 20, 1986. These reports do not appear to have been presented to the jury.
Substantively, our law permits this sort of rebuttal evidence. It is true that the prosecution had no right to offer evidence of wrongs and bad acts to prove Hansen's character or to show he acted in conformity therewith, see Rule 404(b), Miss.R.Ev., but this was competent rebuttal evidence in the face of the showing Hansen made on direct examination of each of these witnesses. Simpson v. State, 497 So.2d 424, 428-29 (Miss. 1986); Winters v. State, 449 So.2d 766, 771 (Miss. 1984). Cole v. State, 525 So.2d 365, 370 (Miss. 1987), and Stringer v. State, 500 So.2d 928, 941 (Miss. 1986), held, when the defendant puts mitigating evidence before the jury during the penalty phase, the prosecution is allowed to counter-attack. "Such rebuttal evidence, offered to negate testimony about specific mitigating factors, is admissible." Cole, 525 So.2d at 370. Such is the case today. Hansen had offered in mitigation that he had behaved well in prison. The prosecution merely rebutted this testimony by challenging and testing the knowledge from which the witnesses testified. See Lanier v. State, 533 So.2d 473, 487 (Miss. 1988).
Rule 405(a), Miss.R.Ev., provides that, "[i]n all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct." The comment to the rule provides:
While 405(a) limits proof of character to reputation or opinion evidence on direct examination, it does provide that the witness may be cross-examined regarding specific acts of conduct. There are two sound reasons for permitting this type of cross-examination. If the witness on cross-examination professes no knowledge about specific acts, his qualifications to state opinion or reputation are impugned. If the witness admits knowledge of specific bad acts, then he has been impeached. Magee v. State, 198 Miss. 642, 22 So.2d 245 (1945).
In the case sub judice Kane, Reichgott and Weist certainly implied opinions of Hansen's peacefulness and adaptability to prison life. All of this was on direct examination by the defense. The prosecutor asked, during cross-examination, about the basis upon which each witness was giving testimony that Hansen had done well while in prison. The questions went to test the witnesses' knowledge and qualifications to give the character evidence each had just given. We find no error here.

XXXV. Jury Argument Re Hansen's Prior Escapes

Hansen complains that in final argument the prosecuting attorney made note of his prior escapes, suggesting these a ground for returning a death sentence. Hansen made no timely objection to the argument at trial and may not complain now. See Part XXI above.

XXXVI. Explanatory Instruction on Hansen's Failure to Testify

Hansen next argues that the Circuit Court erred when it refused his instruction on his failure to testify at the penalty phase.[17] Such instructions have in the past been granted in non-capital cases *149 and at the guilt phase of capital cases, albeit within the Circuit Court's discretion. We have never held the instruction required in any setting.
In Turner v. State, 573 So.2d 657 (Miss. 1990), the defendant did not testify during the guilt phase but did appear at the sentencing phase. During final argument at the sentencing phase, the prosecuting attorney commented upon the defendant's failure to take the witness stand. The defendant argued this comment violated his constitutional rights and Miss. Code Ann. § 13-1-9 (1972). The Turner Court directed that the comment not be repeated at retrial. In Williams v. State, 445 So.2d 798, 814 (Miss. 1984), during the sentencing phase, the prosecution commented on the fact the defendant had not testified during the guilt phase but had made a statement (which was unsworn) during the sentencing phase. The Williams Court held this error which, when considered with other errors, required reversal for a new sentencing hearing.
Read together, Williams and Turner establish the capital defendant's privilege against self-incrimination  secured to him by the Fifth and Fourteenth Amendments to the Constitution of the United States and, independently, by Article 3, Section 26, of the Mississippi Constitution of 1890  attend him at his penalty phase trial. But this does not mean he is of right entitled to the requested instruction. In this case the jury was correctly instructed during the guilt phase regarding Hansen's right to remain silent, and no comment upon this right is at issue here. While it would not have been error had the Court granted the requested instruction, the matter is one largely committed to the Court's sound discretion which we do not consider here to have been abused.

XXXVII. Instruction Regarding Jurors' Individualized
 
Consideration of Mitigating Evidence
Prior to the penalty phase, Hansen objected to the Court giving the jury any instruction which would tell the jurors they should be unanimous in finding a mitigating circumstance before they might weigh it against the prosecution's proof in aggravation. His complaint here is the converse: that the jurors were never instructed affirmatively that they should individually consider the evidence in mitigation.
The jury was instructed that they could employ only such aggravating circumstances as they found (a) unanimously and (b) beyond a reasonable doubt. The Court then told the jury it might consider in opposition mitigating circumstances, gave a loose definition of what those might be, but omitted any burden such as unanimity or beyond-a-reasonable-doubt, only that the jurors consider mitigating circumstances that "are" and thus "exist." Finally, the jury was instructed that, before it could return a sentence of death, it must find beyond a reasonable doubt both that (a) the aggravating circumstances outweigh the mitigating circumstances and (b) that Hansen should be put to death, burdens we have not ordinarily heretofore imposed.[18]See, *150 e.g., Hill v. State, 432 So.2d 427, 451-52 (Miss. 1983) (Robertson, J., dissenting); King v. State, 421 So.2d 1009, 1022 (Miss. 1982) (Hawkins, J., dissenting).
In Shell v. State, 554 So.2d 887 (Miss. 1989), reversed on other grounds, ___ U.S. ___, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), we addressed the adequacy of instructions that did not affirmatively inform each juror that he or she could consider, and weigh against the aggravating circumstances, mitigating circumstances not found unanimously. We recognized that an instruction that prohibits this, expressly or impliedly, is flawed and requires reversal. See Willie v. State, 585 So.2d 660, 680 (Miss. 1991), citing McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and, originally, Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). In Shell the words "unanimous" or "unanimously" did not appear in the mitigating circumstances portion of the jury instructions but instead were found only in the aggravating circumstances portion. We held the instructions did not offend Mills' prohibitory injunction and that Mills contained no affirmative one.
Such is the case now before this Court. The mitigating circumstances portion of the instruction does not contain "unanimous" or "unanimously." Only the aggravating circumstances part contains these words. No instruction says, implies or intimates to any reasonably literate juror that he or she should await unanimity before considering a mitigating circumstance. This issue contains no error. See Turner v. State, 573 So.2d 657, 668 (Miss. 1990); Ladner v. State, 584 So.2d 743, 760 (Miss. 1991) and Willie v. State, 585 So.2d 660, 681 (Miss. 1991), where we rejected a similar argument.

XXXVIII. Mercy Instruction

Hansen argues that the Circuit Court erred when it denied him a mercy instruction. We have noted from time to time that the Circuit Court commits no error when it grants such an instruction. See Turner v. State, 573 So.2d at 668-69; Nixon v. State, 533 So.2d 1078, 1100 (Miss. 1987); Irving v. State, 441 So.2d at 851; Wiley v. State, 484 So.2d 339, 349 (Miss. 1986). On the other hand, our cases have consistently refused to hold that the Court is required to grant a mercy instruction. Ladner v. State, 584 So.2d 743, 760 (Miss. 1991); Shell v. State, 554 So.2d at 905; Williams v. State, 544 So.2d 782, 788 (Miss. 1987); Nixon v. State, 533 So.2d 1078, 1100 (Miss. 1987); Cabello v. State, 471 So.2d 332, 348 (Miss. 1985); see also, Saffle v. Parks, 494 U.S. 484, 492, 110 S.Ct. 1257, 1262, 108 L.Ed.2d 415, 427 (1990). There is no error here.

XXXIX. "Whimsical Doubt" Instruction

Hansen assigns error in the Circuit Court's refusal of his "whimsical doubt" instruction,[19] a notion emanating from several Circuit Court of Appeals opinions of a few years back. Johnson v. Thigpen, 806 F.2d 1243 (5th Cir.1986), and Smith v. Wainwright, 741 F.2d 1248 (11th Cir.1984). *151 This Court recently addressed whimsical or residual doubt instructions in Minnick v. State, 551 So.2d 77, 95 (Miss. 1988), reversed and remanded on other grounds, ___ U.S. ___, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), and held no such instruction was required. The defendant enjoys no right to be spared the death penalty that the jury entertains a whimsical or residual doubt of his guilt, although counsel remains free to argue to the jury any such doubt. The Minnick Court relied on Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). The Franklin opinion focused on
the idea that where a defendant argues residual doubt to the jury, which a defendant is free to do to a relevant extent, the defendant's right to have a jury consider residual doubt is not impaired by the trial court rejecting an instruction on residual doubt.
Minnick, 551 So.2d at 95. See also, Cole v. State, 525 So.2d 365, 371-72 (Miss. 1987).
In the case sub judice the Circuit Court denied the whimsical doubt instruction. The Court did not err in so doing. The record does not reflect that the defendant's counsel was forbidden to argue whimsical or residual doubt to the jury. The issue is without merit.

XL. "Especially Heinous, Atrocious, or Cruel" Instruction

Hansen next presents the familiar complaint regarding our statutory aggravating circumstance, that the capital murder was "especially heinous, atrocious or cruel." See Miss. Code Ann. § 99-19-101(5)(h) (Supp. 1989). Hansen says this aggravating circumstance is unconstitutionally vague and may not be employed against him, citing Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and argues further that the curative and limiting instruction granted by the Circuit Court was insufficient to save it.
We are reminded as well that the limiting instruction given in Shell v. State, 554 So.2d 887, 905 (Miss. 1989), "the word heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others," has been held constitutionally insufficient. See Shell v. Mississippi, 498 U.S. ___, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990). In Ladner v. State, 584 So.2d 743, 763-64 (Miss. 1991), we accepted this view and instructed that our circuit courts "should not grant" this particular instruction.
In the case at bar, the Circuit Court first gave the jury the statutory language: "The capital offense was especially heinous, atrocious or cruel." The Court then instructed the jury:
You are further instructed that the term "heinous, atrocious, or cruel" as used in this instruction means those situations where the actual commission of the capital felony was accomplished by such additional acts to set the crime apart from the norm of capital felonies by the consciencelessness or pitilessness of the crime which is unnecessarily tortuous to the victim.[20]
The statutory text of this troubling aggravator makes clear, if it makes anything clear, that a certain class of aggravated capital murderers is thought particularly deserving of exposure to the death penalty. It refers to the few capital killings that are in an objectively measurable way more horrible and more noxious to civic *152 sensibilities than the run of such crimes. To cure perceived vagueness and enhance principled capital sentencing, this Court has applied different limiting or narrowing instructions to the "heinous, atrocious or cruel" aggravator. The Court in Coleman v. State, 378 So.2d 640, 648 (Miss. 1979) adopted the limiting instruction found in Spinkellink v. Wainwright, 578 F.2d 582, 611 (5th Cir.1978),
What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily tortuous to the victim.

(emphasis original). Evans v. State, 422 So.2d 737, 743 (Miss. 1982), utilized a limiting construction of the aggravating circumstance so that those cases in which "mental torture and aggravation which the victim probably underwent" could be considered "especially heinous, atrocious or cruel." Pinkney v. State, 538 So.2d at 357, found the Court noting:
... barbarity sufficient to satisfy this aggravating circumstance can be demonstrated by showing that the defendant utilized a method of killing which caused serious mutilation, where there is a dismemberment of the corpse, where the defendant inflicted physical or mental pain before death, or where a lingering or torturous death was suffered by the victim. See also, Billiot v. State, 454 So.2d 445, 464-65 (Miss. 1984).
The limiting instruction utilized in the case sub judice tracks the Coleman-Spinkellink language. The United States Supreme Court recently in Clemons v. Mississippi, 494 U.S. 738, 751, 110 S.Ct. 1441, 1449, 108 L.Ed.2d 725, 740 (1990), noted that this Court in its Clemons opinion had "[a]t one point ... recite[d] the proper limiting construction of the `especially heinous' aggravating factor... ." The language to which the Court referred is found at Clemons v. State, 535 So.2d 1354, 1363 (Miss. 1988), and is the Coleman-Spinkellink language the Circuit Court gave Hansen's jury.[21]
The United States Supreme Court has approved a similar limiting instruction in Lewis v. Jeffers, 497 U.S. ___, ___, 110 S.Ct. 3092, 3096, 111 L.Ed.2d 606, 615-16 (1990). And another approved instruction tells the jury, "a murder is committed in an especially cruel manner when `the perpetrator inflicts mental anguish or physical abuse before the victim's death,' [citations omitted] and that `[m]ental anguish includes a victim's uncertainty as to his ultimate fate.'" Walton v. Arizona, ___ U.S. ___, ___, 110 S.Ct. 3047, 3053, 111 L.Ed.2d 511, 523-24 (1990).
We confess candidly we are not clear on the principled distinction between that condemned in Shell and what the Supreme Court has otherwise authorized. In the case sub judice, the limiting instruction given the jury was in words what that Court in Clemons said was proper. It is consistent with the Court's later expressions in Walton and Jeffers. It refined and narrowed the aggravating circumstance of "heinous, atrocious or cruel" and channeled in a principled way the jury's sentencing discretion, excluding the arbitrary and the capricious to the extent reasonably practicable and has fairly facilitated proportionality review. There is no error here.

XLI. Preventing-Arrest-or-Escape-from-Custody Instruction

Hansen next takes issue with the aggravating circumstance found in Miss. Code Ann. § 99-19-101(5)(e) (Supp. 1987), "The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." It is argued some sort of limiting instruction need be given to narrow this aggravator. In Leatherwood v. State, 435 *153 So.2d 645, 651 (Miss. 1983), we rebuffed this contention, stating,
If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to `cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.
Under this construction the Court properly submits this aggravator to the jury, if evidence existed from which the jury could reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing.
In this case, Trooper Ladner had stopped the blue town car and issued a speeding ticket in the name of Christopher Larcinesse, a stolen driver's license Hansen was using. Although this ticket was not admitted to prove Hansen was speeding, the Court did allow it to show why Trooper Ladner pulled the car over. The consent-to-search suggests Ladner suspected more than mere speeding, and Hansen's subsequent aggression may only be seen as an effort to interdict and avoid a lawful arrest. The point for the moment is that these facts form an evidentiary predicate, such that submitting this aggravating circumstance to the jury was not error.

XLII. Ineffective Assistance of Court-Appointed Counsel Via
 
Allegedly Inadequate Statutory Attorney Fees
Hansen argues next that his lawyers were precluded from providing him constitutionally required effective assistance by reason of the minimal fees said to be authorized for court-appointed counsel in cases such as this. Miss. Code Ann. § 99-15-17 (Supp. 1990) limits the compensation an attorney is entitled to when representing an indigent client to $1,000 per case, except in capital cases where two attorneys may be appointed, in which case the compensation shall not exceed $2,000.
In Wilson v. State, 574 So.2d 1338 (Miss. 1990), we held this statute to be constitutional in the face of a like challenge. The statute provides, in addition to the fee enumerated above, the court "shall allow reimbursement of actual expenses." Wilson, 574 So.2d at 1339. This Court recognized a rebuttable presumption that the appointed counsel's actual overhead within this statute is $25.00, and went on to say, "[h]owever, the trial court is bound by this only in the absence of actual proof to the contrary  proof offered by the lawyer that it is more or by the State that it is less." Wilson, 574 So.2d at 1340-41 (emphasis original). The Court held that ineffective assistance claims resulting from the compensation allowed should be decided by reference to Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and progeny, the familiar standards of which attach no import to the cause of counsel's ineffective assistance. Wilson, 574 So.2d at 1341. In that case and another case decided the same day, Pruett v. State, 574 So.2d 1342 (Miss. 1990), the Court remanded for a hearing on the expenses under the statute. See also, Mease v. State, 583 So.2d 1283 (Miss. 1991).
In the case at hand, we find nothing suggesting the statutory limits on court-appointed counsel fees and expenses induced ineffective assistance of counsel. To the contrary, both below and here counsel have pulled out all the stops, well exceeding the Strickland standards. We find no error here.

XLIII. Cumulative Effect of Trial Errors

We consider again Hansen's plea that, though no error in and of itself requires reversal, the Court should consider all errors at trial for their accumulative effect. In the case at bar, we have noted three trial errors, all at the guilt phase. See Parts III, XI and XVIII above. Sensitive that the law obliges that we review cases such as this with heightened scrutiny, and mindful of the enormity of our judgment, we nonetheless hold the errors in this case, given their cumulative effect upon the penalty phase, harmless beyond a reasonable doubt.

*154 XLIV. Proportionality Review

In accordance with Miss. Code Ann. § 99-19-105(3)(a), (b), (c), and (5) (Supp. 1988), we have reviewed the record in this case and have compared it with the other capital murder cases in which this Court has entered a final judgment since Jackson v. State, 337 So.2d 1242 (Miss. 1976), which cases are set forth in Appendix A. Upon review of these prior cases, which we have compared and contrasted with the present case, and considering the aggravating and mitigating circumstances of this and these other cases when weighed against each other, we are of the opinion that death penalty imposed below is not disproportionate nor excessive.
From our independent review, we find and conclude that the Circuit Court did not impose the death sentence under the influence of passion, prejudice or any other arbitrary factor, considering both the crime and the manner in which it was committed and the defendant; that the death penalty imposed on Hansen is consistent with the sentence ordered in like and similar cases; and that the procedures employed at the sentencing phase trial provided a meaningful basis for distinguishing the few cases in which the death penalty is imposed and the many cases in which it is not imposed.
The judgment of the Circuit Court is affirmed and Wednesday, October 30, 1991, is set for the execution of the sentence by the infliction of the death penalty in the manner provided by law.
PETITION FOR REHEARING DENIED; OPINION MODIFIED; CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
ROY NOBLE LEE, C.J., concurs with separate written specially concurring opinion, joined by HAWKINS, P.J., and PITTMAN, BANKS and McRAE, JJ.

APPENDIX

CASES IN WHICH THIS COURT HAS AFFIRMED DEATH PENALTIES
Shell v. State, 554 So.2d 887 (Miss. 1989).
Davis v. State, 551 So.2d 165 (Miss. 1989).
Minnick v. State, 551 So.2d 77 (Miss. 1989).
Pinkney v. State, 538 So.2d 329 (Miss. 1989).
Clemons v. State, 535 So.2d 1354 (Miss. 1988).
Woodward v. State, 533 So.2d 418 (Miss. 1988).
Nixon v. State, 533 So.2d 1078 (Miss. 1987).
Cole v. State, 525 So.2d 365 (Miss. 1987).
Lockett v. State, 517 So.2d 1346 (Miss. 1987).
Lockett v. State, 517 So.2d 1317 (Miss. 1987).
Faraga v. State, 514 So.2d 295 (Miss. 1987).
Jones v. State, 517 So.2d 1295 (Miss. 1987).
Wiley v. State, 484 So.2d 339 (Miss. 1986).
Johnson v. State, 477 So.2d 196 (Miss. 1985).
Gray v. State, 472 So.2d 409 (Miss. 1985).
Cabello v. State, 471 So.2d 332 (Miss. 1985).
Jordan v. State, 464 So.2d 475 (Miss. 1985).
Wilcher v. State, 455 So.2d 727 (Miss. 1984).
Billiot v. State, 454 So.2d 445 (Miss. 1984).
Stringer v. State, 454 So.2d 468 (Miss. 1984).
Dufour v. State, 453 So.2d 337 (Miss. 1984).
Neal v. State, 451 So.2d 743 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
*155 Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).

DEATH PENALTY CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT
Reddix v. State, 547 So.2d 792 (Miss. 1989).
Wheeler v. State, 536 So.2d 1341 (Miss. 1988).
White v. State, 532 So.2d 1207 (Miss. 1988).
Bullock v. State, 525 So.2d 764 (Miss. 1987).
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).
ROY NOBLE LEE, Chief Justice, concurring:
I agree that the judgment and sentence of the lower court should be affirmed, and I concur with the majority. However, I do not agree that the lower court's order on October 6, 1987, denying Hansen a preliminary hearing after he had been indicted, constituted error, harmless or otherwise. The motion was filed June 16, 1987, almost three weeks after the grand jury had indicted Hansen. A preliminary hearing, after indictment, is simply not the method for obtaining discovery, information and evidence in a criminal case. See Avery v. State, Roy Noble Lee, Chief Justice, Dissenting in Part, 555 So.2d at 1046 (Miss. 1990). I would overrule Avery insofar as it held to the contrary.
HAWKINS, P.J., and PITTMAN, BANKS and MCRAE, JJ., join this opinion.
NOTES
[1] Rule 1.04 mandates an initial appearance for "every arrested person ... without unnecessary delay." Hansen was arrested in the early morning hours of April 11, 1987. He was entitled to an initial appearance at least by forty-eight hours thereafter. County of Riverside v. McLaughlin, 500 U.S. ___, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Why the judicial officer conducting the initial appearance did not schedule the preliminary hearing, and why no such hearing was held in the six weeks between arrest and indictment are neither explained nor complained of.
[2] Powers likely calls into serious question what we said in this setting in Nixon v. State, 533 So.2d 1078, 1086 (Miss. 1987), and Cabello v. State, 524 So.2d 313, 317 (Miss. 1988).
[3] Effective July 1, 1991, the legislature amended Section 13-5-69, recognizing that it is subject to "rules promulgated by the Mississippi Supreme Court ... [governing] the examination of jurors." Senate Bill No. 2792, § 104 (Reg.Sess. 1991).
[4] 3.02 VOIR DIRE OF JURORS
In the voir dire examination of jurors the attorney shall direct his questions to the entire panel and shall be permitted to examine an individual juror only when the answer to the question propounded to the entire panel makes such separate examination proper, or for good cause stated by counsel to the court. The attorney shall not propound hypothetical questions that would tie the jury down to finding a particular verdict in a hypothetical situation. In civil cases the voir dire examination shall be limited to fifteen minutes.
[5] 5.02 VOIR DIRE
In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked.
[6] Burglary of a Dwelling:
Cause No. CR 80-2146 Circuit Court, 9th Judicial Circuit, Orange County, Fla.
Conviction had on July 24, 1981
2. Grand Theft:
Cause No. 81-90-CFA Circuit Court, 18th Judicial Circuit, Seminole County, Fla.
Conviction had on July 29, 1981
3. Burglary of a Dwelling:
Cause No. 81-109-CFA Circuit Court, 18th Judicial Circuit, Seminole County, Fla.
Conviction had on July 29, 1981
4. Attempted Escape:
Cause No. 81-290-CFA Circuit Court, 18th Judicial Circuit, Seminole County, Fla.
Conviction had on July 29, 1981
5. Grand Theft:
Cause No. 81-261-CF Circuit Court, 5th Judicial Circuit, Lake County, Fla.
Conviction had on September 14, 1981
6. Grand Theft II:
Cause No. 80-404-CF Circuit Court, 3rd Judicial Circuit, Columbia County, Fla.
Conviction had on February 22, 1982
7. Burglary:
Cause No. 83-10143 CF Circuit Court, 17th Judicial Circuit, Broward County, Fla.
Conviction had on March 12, 1984
8. Escape from Extended Limits of Confinement:
Cause No. 83-10592 CF Circuit Court, 17th Judicial Circuit, Broward County, Fla.
Conviction had on March 12, 1984
9. Burglary of a Dwelling, Count I:
Cause No. 84-1437 Circuit Court, 9th Judicial Circuit, Orange County, Fla.
Conviction had on October 8, 1984
10. Grand Theft, 2nd Degree, Count II:
Cause No. 84-1437 Circuit Court, 9th Judicial Circuit, Orange County, Fla.
Conviction had on October 8, 1984 2Es
[7] 609. IMPEACHMENT BY EVIDENCE OF CONVICTION OF CRIME
(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect on a party, or (2) involved dishonesty or false statement, regardless of the punishment.
[8] There is nothing per se improper about Hansen proceeding as he did, nor with Krecic invoking her privilege. Williamson v. State, 512 So.2d at 872; Hall v. State, 490 So.2d 858, 859 (Miss. 1986).
[9] Douglas' principle lies embedded within our non-constitutional rules of evidence. As there was nothing for Krecic's prior statements to impeach, the prejudicial impact of the prosecution's use of them no doubt far exceeded their probative value, for they had no legally cognizable probative value. Rule 403, Miss.R.Ev.
[10] The two jury instructions at issue are:

Instruction C. 1
Members of the Jury, you have heard all of the testimony and received the evidence and will shortly hear arguments of counsel. The Court will presently instruct you as to the rules of law which you will use and apply to this evidence in reaching your verdict. When you took your places in the jury box, you made an oath that you would follow and apply these rules of law which I shall now state to you. You are not to be concerned with the wisdom of any rule of law. Regardless of any opinion you may have as to what law ought to be, it would be a violation of your sworn duty to base your verdict upon any other view of law than that given you in these instructions by the Court.
Instruction S-1
The Court instructs the jury that if you believe from the evidence in this case beyond a reasonable doubt that the defendant, TRACY ALAN HANSEN, ... did unlawfully, wilfully and feloniously and of his malice aforethought kill and murder a human being, to-wit: David Bruce Ladner, at a time when the said David Bruce Ladner was a police officer with the Mississippi Highway Safety Patrol and was acting in his official capacity as such, and the defendant, TRACY ALAN HANSEN, knew that David Bruce Ladner was a police officer and not in necessary self-defense, then if you so believe from the evidence in this case beyond a reasonable doubt, then the defendant is guilty of Capital Murder and it is your sworn duty to say so by your verdict.
[11] Jury Instruction GP-12
The testimony of a law enforcement officer should be considered by you just as any other evidence in the case. In evaluating his or her credibility you should use the same guidelines which you apply to the testimony of any witness. In no event should you give either greater or lesser credence to the testimony of any witness merely because he or she is a law enforcement officer.
[12] We find among the more general instructions the Court did give the jury the following:

As sole judges of the facts in this case your exclusive province is to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required to use your common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified in this case.
[13] Hansen requested a general instruction which reads:

Jury Instruction GP-13
The Court instructs the Jury that if the prosecution has offered identification testimony, that is, the testimony of an alleged eyewitness who allegedly saw TRACY HANSEN commit the act charged or anything related thereto, then you may consider the witness's opportunity to observe the perpetrator during the commission of the act charge[d] or any part thereof. The testimony of the witness that he is positive of his identification may be considered to have whatever value that you, the Jury, desire to give it, but that alone does not relieve you of your duty to consider his or her identification testimony and to reject it if you find it unreliable. The alleged identification must meet with your satisfaction beyond a reasonable doubt that the perpetrator was, in fact, TRACY HANSEN, and if the prosecution has not proved the identification of your satisfaction, beyond a reasonable doubt, then you shall find TRACY HANSEN not guilty.
[14] Davis v. State, 568 So.2d 277, 279-81 (Miss. 1990), is consistent with the above view. Nothing in the instruction considered in Davis is in the nature of a cautionary instruction, one that would tell the jury it should view eyewitness testimony more skeptically or critically than it might receive other evidence. Rather, Davis addresses the circuit court's discretionary authority in formulating an instruction that would guide and sensitize the jury's consideration of eyewitness identification testimony.
[15] Almost two months before trial, Hansen had moved the Court, should he be convicted of capital murder, for immediate sentencing as an habitual offender, and for leave thereafter to present evidence at the penalty phase of his lack of parole eligibility.
[16] NO. C2S
If you recommend a death sentence the Court shall sentence the defendant to the penalty of death, however, in the event you recommend a life sentence or are unable to agree upon punishment the Court shall sentence the defendant to Life Imprisonment and that sentence will be without parole or probation in view of the Defendant's prior convictions. [Emphasis added]
[17] The instruction Hansen requested reads:

JURY INSTRUCTION D-PPF(B)
The defendant is under no duty to present evidence or testify. If he does not present evidence, or does not become a witness on his own behalf, no adverse or harmful inference may be drawn against him whatsoever.
There are many reasons why a person may not present evidence which have nothing to do with guilt or innocence. He may not be well educated. He may not be articulate. Public attention may make him nervous and too ill at ease to gather their thought or speak will (sic). A person may not testify for the simple reason that it is his or her legitimate and respected constitutional right not to testify.
Despite the number and variety of reasons why a person might not testify or present evidence, you are not to speculate concerning the reasons in this case. Nor are you to draw any inference whatsoever, beneficial or detrimental, and it shall not have any bearing on your consideration of the evidence or issues in this case.
[18] Pertinent parts of the Court's instructions include:

Next, in order to return the death penalty, you must find unanimously beyond a reasonable doubt that one or more of the following elements, if any, of aggravation exists:
.....
If, however, one or more of the above aggravating circumstances is found to exist beyond a reasonable doubt then you must consider whether there are mitigating circumstances. You may consider the following examples in mitigation  those which tend to warrant the less severe penalty of life imprisonment  in determining the death sentence should not be imposed:
.....
If you find from the evidence that one or more of the above elements of mitigation exists, then you must find unanimously and beyond a reasonable doubt that the aggravating circumstances, which you must already have found, outweigh beyond a reasonable doubt mitigating circumstances before you can return a sentence of death.
.....
The verdict you return must be written on a separate sheet of paper and signed by the foreman. Your verdict should be written in one of the following forms:
(1) We, the jury, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:
.....
Next, "We, the jury, unanimously find that the aggravating circumstances of: ... Is/are sufficient to impose the death penalty, and we unanimously find beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating circumstances and we unanimously find beyond a reasonable doubt that the Defendant should suffer the penalty of death."
.....
For the purposes of these deliberations, aggravating circumstances, if any, must be found beyond a reasonable doubt; mitigating may be established if there is any evidence to support the same.
[19] At the sentencing phase, Hansen requested the following instruction:

Before going further in this case, you must again scrutinize the facts and evidence surrounding the death of Bruce Ladner. While you have found beyond a reasonable doubt that Tracy Hansen is responsible for the death, you must now ask if you can say beyond a residual or lingering doubt that the Defendant is the person who killed Bruce Ladner.
A residual doubt is not the same as a reasonable doubt. There may be no reasonable doubt left in your minds. Yet, some genuine doubt may still exist. It may reflect a mere possibility. It may be the mere whimsy of one juror or several... .
[20] Hansen had requested that the Court instruct the jury as follows:

I further charge you that it is not sufficient that some of you believe that the killing was especially heinous, while others among you believe that the killing was especially atrocious or cruel. Instead, before you may find this aggravating circumstance, you must all agree as to the precise act or circumstance that would render the homicide especially heinous, atrocious or cruel. Otherwise you may not conclude that the evidence demonstrates that this alleged aggravating circumstance exists.
While I by no means want to suggest or imply that the aggravating circumstance exists, if you conclude beyond a reasonable doubt that it does exist, your verdict form must state which of the elements  heinous, atrocious or cruel  you found to be involved in the homicide.
The Court denied this instruction.
[21] The instruction reads: "The element of cruelty involves the pain and the mental and physical distress visited upon the victims. Heinous and depraved involve the mental state and attitude of the perpetrator as reflected in his words and actions. `Heinous' means `hatefully or shockingly evil'; `grossly bad'; `cruel' means `disposed to inflict pain esp. in a wanton, insensate or vindictive manner'; `sadistic'; and `depraved' means `marked by debasement, corruption, perversion or deterioration.'" Lewis, 497 U.S. at ___, 110 S.Ct. at 3096, 111 L.Ed.2d at 615-16.